# CALIFORNIA ET AL. *v.* SOUTHLAND ROYALTY CO.
## ET AL.

No. 76–1114. Argued December 7, 1977—Reargued April 17, 1978—
Decided May 31, 1978*

---

*Together with No. 76–1133, *El Paso Natural Gas Co.* v. *Southland Royalty Co. et al.;* and No. 76–1587, *Federal Energy Regulatory Commission* v. *Southland Royalty Co. et al.,* also on certiorari to the same court.

520

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 531. STEWART and POWELL, JJ., took no part in the consideration or decision of the cases.

*Randolph W. Deutsch* reargued the cause for petitioners in No. 76–1114. With him on the briefs were *Janice E. Kerr* and *J. Calvin Simpson. Deputy Solicitor General Barnett* reargued the cause for petitioner in No. 76–1587. On the briefs were *Solicitor General McCree, Richard A. Allen, Robert W. Perdue,* and *Philip R. Telleen. C. Frank Reifsnyder, Arthur R. Formanek,* and *Richard S. Morris* filed briefs for petitioner in No. 76–1133.

*J. Evans Attwell* reargued the cause for respondents in all cases. With him on the brief were *Martin N. Erck, Sherman S. Poland, Bernard A. Foster III,* and *Roger L. Brandt. William Pannill* and *F. H. Pannill* filed a brief for respondent Crane County Development Co.

*John L. Hill,* Attorney General, reargued the cause for the State of Texas as *amicus curiae* urging affirmance in all cases. With him on the brief were *David M. Kendall,* First Assistant Attorney General, *Steve Van,* Assistant Attorney General, and *Frank C. Cooksey.*†

†*Frederick Moring* and *James A. Wilderotter* filed a brief for the Associated Gas Distributors as *amicus curiae* urging reversal in all cases.

Briefs of *amici curiae* urging affirmance were filed by *James R. Patton, Jr., Harry E. Barsh, Jr., Edwin W. Edwards,* Governor, and *William J. Guste, Jr.,* Attorney General, for the State of Louisiana; and by *Toney*

Mr. Justice White delivered the opinion of the Court.

In 1925 the owners of certain acreage in Texas executed a lease which gave to Gulf Oil Corp., as lessee, the exclusive right to produce and market oil and gas from that land for the next 50 years.[1] Gulf was entitled to drill wells, string telephone and telegraph wires, and build storage facilities and pipelines on the land. Gulf would also have "such other privileges as are reasonably requisite for the conduct of said operations." App. 135. In exchange, the owners were to receive a royalty based on the quantity of natural gas produced and the number of producing wells, as well as other royalties and payments. The following year, the owners of the property sold one-half of their mineral fee interest to respondent Southland Royalty Co. and the rest to other respondents.

In 1951 Gulf contracted to sell casinghead gas from the leased property to the El Paso Natural Gas Co., an interstate pipeline. After this Court's decision in *Phillips Petroleum Co. v. Wisconsin,* 347 U. S. 672 (1954), Gulf applied for a certificate of public convenience and necessity from the Federal Power Commission authorizing the sale in interstate commerce of 30,000 Mcf per day. By order dated May 28, 1956, the Commission granted a certificate of unlimited duration, and this certificate was among those construed as "permanent" by

---

*Anaya,* Attorney General, *Vernon O. Henning,* Assistant Attorney General, and *William O. Jordan,* Special Assistant Attorney General, for the State of New Mexico.

*Peter H. Schiff* and *Richard A. Solomon* filed a brief for the Public Service Commission of the State of New York as *amicus curiae.*

[1] The "Waddell" lease, executed on July 14, 1925, covered 45,771 acres in Crane County, Tex. In the same year Gulf executed an identical lease, the "Goldsmith" lease, with the owners of 19,840 acres in Ector County, Tex. The gas remaining at the expiration of both leases is at issue in this litigation, but because the parties are in agreement that there are no material differences in the language or history of these leases, we shall discuss only the Waddell lease.

this Court in *Sun Oil Co.* v. *FPC,* 364 U. S. 170, 175 (1960).[2] Gulf entered into a second contract to sell additional volumes of gas to El Paso in 1972, and obtained a certificate of unlimited duration for those volumes in 1973.

The original 50-year lease obtained by Gulf expired on July 14, 1975, and, under local law, the lessee's interest in the remaining oil and gas reserves terminated and reverted to respondents. See *Gulf Oil Corp.* v. *Southland Royalty Co.,* 496 S. W. 2d 547 (Tex. 1973). Just prior to expiration of the lease, respondents arranged to sell the remaining casinghead gas to an intrastate purchaser, at the higher prices available in the intrastate market.

El Paso, in order to preserve one of its sources of supply, then filed a petition with the Commission seeking a determination that the remaining gas reserves could not be diverted to the intrastate market without abandonment authorization pursuant to § 7 (b) of the Natural Gas Act of 1938, 52 Stat. 824, as amended, 15 U. S. C. § 717f (b) (1976 ed.).[3] The Commission agreed with this contention, relying on the "principle established by Section 7 (b) that 'service' may not be abandoned without our permission and approval." *El Paso Natural Gas Co.,* 54 F. P. C. 145, 150, 10 P. U. R. 4th 344, 348 (1975). The Commission held that respondents could not,

---

[2] The Commission's order of May 28, 1956, had granted more than 100 certificates with identical language. This Court's decision in *Sun Oil,* though prompted by a dispute over a specific certificate, interpreted the Commission's order as it applied to the entire "batch of certificates." 364 U. S., at 175.

[3] Texaco, Inc., owner of a 25% interest in the reversion under the Goldsmith Lease, sec n. 1, *supra,* also filed a petition with the Commission, seeking a declaration that upon expiration of the lease the fee owners would be free to sell the remaining gas to intrastate purchasers. Although Texaco's interest was adverse to El Paso, Texaco's petition raised the same issues as El Paso's petition and was therefore consolidated with it. The State of California and its Public Utilities Commission intervened in the consolidated proceeding.

upon termination of the lease, sell gas in intrastate commerce without prior permission from the Commission under § 7 (b) of the Natural Gas Act and that Gulf was also obligated to seek abandonment permission. The Commission reaffirmed this view in an order denying rehearing, but added language insuring that any deliveries of gas to El Paso during the period that the Commission's order was under review would not constitute a dedication of those reserves to the interstate market. *El Paso Natural Gas Co.*, 54 F. P. C. 2821, 11 P. U. R. 4th 488 (1975).

On respondents' petition for review, the Court of Appeals for the Fifth Circuit reversed. *Southland Royalty Co.* v. *FPC*, 543 F. 2d 1134 (1976). The court held that Gulf, as a tenant for a term of years, could not legally dedicate that portion of the gas which Southland and other respondents might own upon expiration of the lease. Because of the importance of the question presented to the authority of the Federal Power Commission, now the Federal Energy Regulatory Commission, we granted the petition for certiorari. 433 U. S. 907. We reverse.

The fundamental purpose of the Natural Gas Act is to assure an adequate and reliable supply of gas at reasonable prices. *Sunray Mid-Continent Oil Co.* v. *FPC*, 364 U. S. 137, 147, 151–154 (1960); *Atlantic Refining Co.* v. *Public Serv. Comm'n of New York*, 360 U. S. 378, 388 (1959). To this end, not only must those who would serve the interstate market obtain a certificate of public convenience and necessity but also, under § 7 (b) of the Act:

> "No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the con-

tinuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U. S. C. § 717f (b) (1976 ed.).

The Commission may therefore control both the terms on which a service is provided to the interstate market and the conditions on which it will cease:

"An initial application of an independent producer, to make movements of natural gas in interstate commerce, leads to a certificate of public convenience and necessity under which the Commission controls the basis on which 'gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval.'" *Sunray Mid-Continent Oil Co., supra,* at 156.

The Act was "so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Atlantic Refining Co.* v. *Public Serv. Comm'n of New York, supra,* at 388.

The jurisdiction of the Commission extends to the transportation of natural gas in interstate commerce or the sale in interstate commerce for resale to consumers. § 1 (b), 15 U. S. C. § 717 (b) (1976 ed.). Gas which flows across state lines for resale is dedicated to interstate commerce regardless of the intentions of the producer. *California* v. *Lo-Vaca Co.,* 379 U. S. 366 (1965). The Court there approved an approach to questions of the Commission's jurisdiction based on the physical flow of the gas:

"We said in *Connecticut Co.* v. *Federal Power Comm'n,* 324 U. S. 515, 529, 'Federal jurisdiction was to follow the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental, test.' And that is the test we have followed under both the Federal Power Act and the Natural Gas Act, except as Congress itself

has substituted a so-called legal standard for the technological one. *Id.*, at 530–531." *Id.*, at 369.

The Court reasoned that in the circumstances of that case,[4] "[t]he fact that a substantial part of the gas will be resold [in interstate commerce] . . . invokes federal jurisdiction at the outset over the entire transaction." *Ibid.*

In this litigation the Commission held that once gas began to flow in interstate commerce from a field subject to a certificate of unlimited duration, that flow could not be terminated unless the Commission authorized an abandonment of service. The initiation of interstate service pursuant to the certificate dedicated all fields subject to that certificate. The expiration of a lease on the field of gas did not affect the obligation to continue the flow of gas, a service obligation imposed by the Act.

We think that the Commission's interpretation of the abandonment provision of the Natural Gas Act is a permissible one. In *Sunray Mid-Continent Oil Co.* v. *FPC,* the Court recognized that the obligation to serve the interstate market imposed by a certificate of unlimited duration could not be terminated by private contractual arrangements. In that case, a producing company which had contracted with a pipeline to supply gas for 20 years sought a certificate from the Commission limited to that period. The Commission insisted on a permanent certificate; and this Court upheld its authority to do so, holding that even after the contract had expired, the producer would remain under an obligation to supply gas to

---

[4] In *California* v. *Lo-Vaca Co.,* an interstate pipeline had entered into a private contractual arrangement with a producer that all gas purchased pursuant to the agreement would be for internal use only. Despite this explicit reservation intended to remove this gas from the jurisdiction of the Commission, the Court held that the Commission had jurisdiction over the entire transaction because at least some part of the contract gas, physically commingled in the pipeline with gas from other sources, would be sold to other interstate purchasers.

the pipeline, unless permission to abandon service had been obtained. The obligation on the producer which survived after the contract term "will not be one imposed by contract but by the Act." 364 U. S., at 155. The obligation to continue the service despite the provisions of the sales contract was held essential to effectuate the purposes of the Act; otherwise producers and pipelines would be free to make arrangements that would circumvent the ratemaking and supply goals of the statute. *Id.*, at 142–147.

Similar principles control this litigation. This issuance of a certificate of unlimited duration covering the gas at issue here created a federal obligation to serve the interstate market until abandonment authorization had been obtained. The Commission reasonably concluded that under the statute the obligation to continue service attached to the gas, not as a matter of contract but as a matter of law, and bound all those with dominion and power of sale over the gas, including the lessors to whom it reverted. Just as in *Sunray*, the service obligation imposed by the Commission survived the expiration of the private agreement which gave rise to the Commission's jurisdiction.

Respondents seek to distinguish *Sunray* on the ground that the producer in that case owned all of the gas covered by the certificate, but the central theme of that opinion is that the Act is concerned with the continuation of "service" rather than with particular sales of gas or contract rights. The Court traced the language of the statute to show that "all the matters for which a certificate is required—the construction of facilities or their extension, as well as the making of jurisdictional sales—must be justified in terms of a 'service' to which they relate." *Id.*, at 150. The Court specifically noted that "§ 7 (b) does not refer to the abandonment of the continuation of sales, but rather to the abandonment of 'services.' " *Id.*, at 150 n. 17. The Commission "[had] long drawn a distinction between the underlying service to the public a natural gas company performs and the specific manifesta-

tion—the contractual relationship—which that service takes at a given moment." *Id.*, at 152. Just as the federal obligation to continue service was held paramount to private arrangements in *Sunray,* that obligation must be recognized here. Once the gas commenced to flow into interstate commerce from the facilities used by the lessees, § 7 (b) required that the Commission's permission be obtained prior to the discontinuance of "any service rendered by means of such facilities." Private contractual arrangements might shift control of the facilities and thereby determine *who* is obligated to provide that service, but the parties may not simply agree to terminate the service obligation without the Commission's permission.

Respondents contend that the gas at issue here was never impressed with an obligation to serve the interstate market because it was never "dedicated" to an interstate sale. The core of their argument is that "no man can dedicate what he does not own." Brief for Respondent Southland Royalty Co. et al. 8. This maxim has an appealing resonance, but only because it takes unfair advantage of an ambiguity in the term "dedicate." For most lawyers, as well as laymen, to "dedicate" is to "give, present, or surrender to public use." Webster's Third New International Dictionary 589 (1961). But gas which is "dedicated" pursuant to the Natural Gas Act is not surrendered to the public; it is simply placed within the jurisdiction of the Commission, so that it may be sold to the public at the "just and reasonable" rates specified by § 4 (a) of the Act, 15 U. S. C. § 717c (a) (1976 ed.). Judicial review insures that those rates will not be confiscatory. See *FPC* v. *Natural Gas Pipeline Co.,* 315 U. S. 575 (1942); *FPC* v. *Hope Gas Co.,* 320 U. S. 591, 602–603 (1944). Thus, by "dedicating" gas to the interstate market, a producer does not effect a gift or even a sale of that gas, but only changes its regulatory status.[5]

---

[5] An analogy in state law may be found in the power of a tenant to seek a change in the zoning status of leased property. See, *e. g., Newport*

Here, the lessee dedicated the gas by seeking and receiving a certificate of unlimited duration from the Commission. Respondents apparently had no objection, for they could have intervened in those proceedings but did not do so. *El Paso Natural Gas Co.,* 54 F. P. C. 917, 919 n. 3 (1975).

Respondents also appear to argue that they should not be viewed as "natural gas companies" with respect to the Waddell Ranch gas because they have not voluntarily committed any act that would place them within the Commission's jurisdiction. As we have seen, this argument is somewhat beside the point, for the obligation to serve the interstate market had already attached to the *gas,* and respondents became obligated to continue that service when they assumed control of the gas. In the Commission's language, "the dedication involved is not the dedication of an individual party or producer, but the dedication of gas." 54 F. P. C., at 149, 10 P. U. R. 4th, at 348.

In any event, we perceive no unfairness in holding respondents, as lessors, responsible for continuation of the service until abandonment is obtained. Respondents were "mineral lease owners who entered into a lease that permitted the lease holders to make interstate sales." 54 F. P. C., at 920. They did not object when Gulf sought a certificate from the Commission. Indeed, as the Commission pointed out, Gulf may even have been under a duty to seek interstate purchasers for the gas. *Id.,* at 919. Gas leases are typically construed to include a duty diligently to develop and market, see, *e. g.,* 5 H. Williams & C. Meyers, Oil and Gas Law § 853 (1977), and at the time the certificate was sought the interstate market was the major outlet for gas, see *Atlantic Refining Co.* v. *Public Serv. Comm'n of New York,* 360 U. S., at 394. Having authorized Gulf to make interstate

Associates, Inc. v. *Solow,* 30 N. Y. 2d 263, 283 N. E. 2d 600 (1972), cert. denied, 410 U. S. 931 (1973); *Richman* v. *Philadelphia Zoning Board of Adjustment,* 391 Pa. 254, 258, 137 A. 2d 280, 283 (1958).

sales of gas, respondents could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market. Cf. *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 482 (1911).[6]

In *Sunray,* the Court discussed the "practical consequences" for the consumer if the term of the sales contract limited the term of the certificate. 364 U. S., at 143, 142–147. The Court reasoned:

"If petitioner's contentions . . . were . . . sustained, the

---

[6] Moreover, the type of regulation which the Commission has here imposed is not without precedent. As we recognized in *Sunray,* § 7 (b) of the Natural Gas Act "follows a common pattern in federal utility regulation." 364 U. S., at 141–142. Section 1 (18) of the Interstate Commerce Act, 49 U. S. C. § 1 (18), similarly provides that "no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." At a very early date the Interstate Commerce Commission interpreted this provision to require that a certificate of abandonment be obtained prior to the cessation of operations over leased tracks, even though the lease had expired by its own terms. *Chicago & Alton R. Co.* v. *Toledo, Peoria & Western R. Co.,* 146 I. C. C. 171 (1928). In *Lehigh Valley R. Co. Proposed Abandonment of Operation,* 202 I. C. C. 659 (1935), the Commission held that even a lessor which had ceased to operate as a railroad prior to enactment of the Interstate Commerce Act would be required to seek permission to abandon a railroad line which had reverted to it upon expiration of a lease. Long before Gulf applied for its certificate, this Court approved these decisions. See *Smith* v. *Hoboken R., Warehouse & S. S. Connecting Co.,* 328 U. S. 123, 130 (1946) ("[A] certificate is required under § 1 (18) whether the lessee or the lessor is abandoning operations"); *Thompson* v. *Texas Mexican R. Co.,* 328 U. S. 134, 144–145 (1946) ("[T]he fact that the trackage contract was entered into in 1904 prior to the passage of the Act is immaterial; the provisions of the Act, including § 1 (18), are applicable to contracts made before as well as after its enactment"). These precedents demonstrate that the specific type of obligation imposed here—an obligation to continue interstate service until abandonment has been obtained—is within the range of regulatory possibilities that must be anticipated by one profiting from interstate operations.

way would be clear for every independent producer of natural gas to seek certification only for the limited period of its initial contract with the transmission company, and thus automatically be free at a future date, untrammelled by Commission regulation, to reassess whether it desired to continue serving the interstate market." *Id.*, at 142.

A "local economy which had grown dependent on natural gas as a fuel" might experience disruption or significantly higher prices. *Id.*, at 143. These observations are equally pertinent to private arrangements by way of leases. If the expiration of a lease to mineral rights terminated all obligation to provide interstate service, producers would be free to structure their leasing arrangements to frustrate the aims and goals of the Natural Gas Act.

Respondents suggest that the Commission could require a voluntary assumption of the service obligation by the lessor as a condition to certificates issued in the future. It is obvious that this solution does nothing to protect those communities presently depending on the flow of gas pursuant to a certificate of unlimited duration already issued. Moreover, the Court questioned in *Sunray* whether the conditioning power could be used to achieve indirectly what the Act did not authorize the Commission to do directly. *Id.*, at 152. In light of this tension, the Court concluded that "the Commission's power to protect the public interest under § 7 (e) need not be restricted to these indirect and dubious methods." *Ibid.*

We conclude that the Commission acted within its statutory powers in requiring that respondents obtain permission to abandon interstate service. "A regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law." *United Gas Improvement Co.* v. *Continental Oil Co.*, 381 U. S. 392, 400 (1965). By tying the concept of dedication to local property law, respondents would cripple the authority of the Commission at a time when the need for decisive action is greatest. Guided by

*Sunray,* we believe that the structure and purposes of the Natural Gas Act require a broader view of the Commission's authority.

The decision of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE STEWART and MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE STEVENS, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The disparity between the regulated price of natural gas in the interstate market and the unregulated price in the Texas market gives this case its importance.[1] The legal issue depends on the meaning of § 7 (b), the abandonment provision of the Natural Gas Act.[2] Speaking for the United States

---

[1] At the time the Court of Appeals for the Fifth Circuit delivered its opinion in this case, there was a "gross imbalance between controlled prices at which interstate natural gas [was] sold and the substantially higher values set by the free market for gas . . . ." *Southland Royalty Co.* v. *FPC,* 543 F. 2d 1134, 1135 (1976) (citation omitted). Although the Federal Power Commission (now the Federal Energy Regulatory Commission) has taken some action to correct this imbalance, see *National Rates for Natural Gas,* 56 F. P. C. 2698, 15 P. U. R. 4th 21 (1976), aff'd *sub nom. American Public Gas Assn.* v. *FPC,* 186 U. S. App. D. C. 23, 567 F. 2d 1016 (1977), a "substantial disparity" still exists. Brief for Petitioner in No. 76–1587, pp. 6–7, n. 9.

[2] "No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U. S. C. § 717f (b) (1976 ed.).

Court of Appeals for the Fifth Circuit, Judge Clark framed the question in this way:

> "Does the lessee under a 50-year fixed-term mineral lease, by making certificated sales of leasehold natural gas in interstate commerce, thereby dedicate to interstate commerce the gas which remains in the ground at the end of the 50th year?" *Southland Royalty Co.* v. *FPC,* 543 F. 2d 1134, 1136 (1976).

In my opinion, the Fifth Circuit correctly answered that question in the negative and ruled that the lessors did not have to seek the Commission's abandonment approval under § 7 (b).

Through two separate leases executed in 1925, Gulf Oil Corp. obtained the right to explore, produce, and market oil and gas from specified acreage in Texas.[3] The leases were for a fixed term of 50 years, and the reversionary interests in the minerals were shared by a number of fee owners (respondents), of which Southland Royalty Co. is the largest.[4] As lessors of the property, respondents received a royalty based on the quantity of natural gas produced and the number of producing wells.[5] Gulf's interest in the leased gas terminated, as a matter of Texas law, in 1975, and the mineral rights reverted to respondents. See *Gulf Oil Corp.* v. *Southland Royalty Co.,* 496 S. W. 2d 547 (Tex. 1973).

In 1951, well before its leasehold interest expired, Gulf

---

[3] See *ante,* at 521 n. 1.

[4] Southland acquired one-half of the mineral fee interest in the Waddell lease in 1926; the remaining fractional interests are owned by over 100 other companies and persons. The ownership of the reversionary mineral estate of the Goldsmith lease is also dispersed; Texaco, Inc., is apparently the largest single owner, having acquired a one-fourth interest in 1929.

[5] Respondents' royalty interest was $\frac{1}{8}$ of 4¢ per Mcf (thousand cubic feet) for all casinghead gas produced and sold from the lease; they had no right to take gas in kind or to receive a royalty based on the price received by the lessee for the gas. App. 135–140.

contracted to sell casinghead gas [6] to the El Paso Natural Gas Co., an interstate pipeline.[7] Thereafter, Gulf applied for, and the Federal Power Commission issued, a certificate of public convenience and necessity authorizing its sale of natural gas to El Paso, to be effective as long as Gulf continued its authorized operations in accordance with the statute and applicable regulations. See n. 13, *infra*. The price of the gas sold by Gulf to El Paso was then regulated by the Commission. The price of gas on the intrastate market was, however, not subject to such regulation. Shortly before the expiration of the leases, Southland and the other mineral fee owners therefore made plans to sell their casinghead gas in the intrastate market as soon as the leases expired.[8] In order to preserve one of its sources of supply, El Paso filed a petition with the Commission seeking a determination that the leasehold gas had been dedicated to interstate commerce and could not be withdrawn from that market without Commission approval.[9]

The Commission held that Southland and the other mineral interest owners may not divert leasehold gas into the local market without prior Commission approval. The Commission noted that its decision was not supported by direct

---

[6] Casinghead gas is found in association with crude oil; it is to be distinguished from "gas-well gas."

[7] Gulf sold its gas from the Goldsmith lease to Phillips Petroleum Co., which processed the gas and sold it to El Paso, which in turn transported the gas in interstate commerce for subsequent resale. For the purposes of this case, the parties have agreed that there are no material differences between the Goldsmith and Waddell leases. See *ante*, at 521 n. 1.

[8] Southland entered into a contract with Intratex Gas Co. and Intrastate Pipeline Co., which primarily serves a distributor in Houston, Tex.

[9] Docket No. CP75–209, commenced by El Paso on January 20, 1975, related to the Waddell lease. Docket No. CI75–594, relating to the Goldsmith lease, was commenced by Texaco on April 8, 1975. Although the interest of Texaco was adverse to El Paso, its petition for a declaratory order raised the same issue as did the El Paso petition in No. CP75–209.

precedent, but reasoned that Gulf had made a dedication of the leasehold gas which imposed a service obligation on the gas itself, rather than on any particular party.[10]

On respondents' petition for review, the Court of Appeals reversed. The court held that Gulf, as a tenant for a term of years, could not legally dedicate that portion of the gas which Southland and the other reversioners might own upon expiration of the lease. It rejected the Commission's argument that since Gulf had an unquantified right during the 50-year term, it had a legal right to withdraw all of the leased gas, and therefore was empowered to dedicate the entire supply to the interstate market. The court reasoned that Gulf's interest in the gas was contingent upon its removal within 50 years and that its right to dedicate the gas to interstate commerce was subject to the same contingency.[11] The Commission's alternative argument that the acceptance of royalty payments constituted ratification of the dedication to interstate commerce was rejected on the ground that the holders of the reversionary interest had no right to control Gulf's sale of the gas during the lease term.

In this Court, petitioners[12] argue that a *lessee's* acceptance

---

[10] "In our opinion the various mineral interest reversioners may not sell gas from the two leaseholds in intrastate commerce without prior permission and approval of the Commission. Although we have discovered no case directly on point, we are of the opinion that the cases and the purpose of the Natural Gas Act inevitably lead to this view. . . . [T]he dedication involved is not the dedication of an individual party or producer, but the dedication of gas." *El Paso Natural Gas Co.,* 54 F. P. C. 145, 149, 10 P. U. R. 4th 344, 347–348 (1975).

[11] "To the extent that Gulf's present interest in all of the natural gas is contingent upon its removal within 50 years, the right to dedicate that gas removed to interstate commerce is likewise contingent. Whatever gas is left under the lease lands at the end of the 50 years is not Gulf's gas and, by the plain terms of the limited leasehold estate, never belonged to it from day one forward." 543 F. 2d, at 1138.

[12] Petitioners in this case are the Commission, El Paso, and the State of

of a certificate of convenience and necessity of unlimited duration creates a service obligation which the *lessors* may never abandon without Commission authorization. They rely primarily on this Court's decision in *Sunray Mid-Continental Oil Co. v. FPC,* 364 U. S. 137; secondarily on somewhat analogous cases arising under the Interstate Commerce Act; and finally on their analysis of the practical consequences of the Court of Appeals' interpretation of the statute. I consider these arguments in turn.

I

Although *Sunray Oil* is of immediate concern, that decision must be considered in the context of the jurisdictional development of the Natural Gas Act that began in 1954 with *Phillips Petroleum Co. v. Wisconsin,* 347 U. S. 672. In *Phillips,* the Court held that sales of natural gas by an independent producer to an interstate pipeline were subject to the jurisdiction of the Federal Power Commission. The Court rejected the independent producer's claim that the Act was concerned only with regulating interstate pipelines and, instead, held that the FPC's jurisdiction was based on the broader concept of interstate "sales" of natural gas. One obvious result of *Phillips* was the sudden expansion of the Commission's jurisdictional responsibilities. *Permian Basin Area Rate Cases,* 390 U. S. 747, 756–757.[13] Less obviously, but perhaps more importantly,

California, which intervened in the suit below on the ground that El Paso was one of its major suppliers of natural gas.

[13] After the decision in *Phillips,* the natural gas companies already supplying gas to the interstate market had to apply for Commission approval of that service. The certificate issued to Gulf in this case in 1956 was one of a large number which were issued in a post-*Phillips* consolidated proceeding. The certificate stated in relevant part:

"The Commission *orders*

"(A) A certificate of public convenience and necessity be and is hereby issued, upon the terms and conditions of this order, authorizing the sale by Applicant of natural gas in interstate commerce for resale, together with the operation of any facilities, subject to the jurisdiction of the Com-

it marked the first step in the development of a regulatory scheme for natural gas that is unique in public utility regulation. As Mr. Justice Harlan observed, "[p]roducers of natural gas cannot usefully be classed as public utilities." *Id.*, at 756. "Unlike other public utility situations, the relationship which ultimately may subject the independent producer to regulation under the Natural Gas Act has its usual inception in a contract between a producer . . . of natural gas . . . and an interstate pipeline . . . ." 5 W. Summers, Law of Oil and Gas § 924, p. 7 (1966). But while the voluntary sale of natural gas to an interstate pipeline is the event that normally activates the jurisdiction of the Commission,[14] the contractual terms of the sale do not define the limits of that jurisdiction.

In *Sunray Oil,* the Court held that a natural gas company had made a dedication of gas to interstate commerce of unlimited duration even though its sales contract with the interstate pipeline was for a fixed term of 20 years. The company had applied to the Commission for a limited certificate of convenience and necessity authorizing interstate

---

mission, used for the sale of natural gas in interstate commerce, as hereinbefore described and as more fully described in the application and exhibits in this proceeding.

"(B) The certificate issued herein shall be deemed accepted and of full force and effect, unless refused in writing and under oath by Applicant within 30 days from issuance of this order.

"(C) The certificate is not transferable and shall be effective only so long as Applicant continues the acts or operations hereby authorized in accordance with the provisions of the Natural Gas Act, and the applicable rules, regulations and orders of the Commission." App. 37. See *Sun Oil Co.* v. *FPC,* 364 U. S. 170, 171–172.

In 1972, Gulf entered into a second contract with El Paso covering gas produced from wells covered by the leases in question, and the Commission granted Gulf another certificate covering sales under that contract.

[14] As this Court has previously noted, "the scheme of the Act was one which built the regulatory system on a foundation of private contracts." *Sunray Oil,* 364 U. S., at 154; see also *United Gas Pipe Line Co.* v. *Mobil Gas Service Corp.,* 350 U. S. 332.

sales only for the term of the contract. The Commission, however, tendered the company an unlimited certificate. The Court ruled that by accepting that certificate and by exercising the authority granted by it, the company undertook a service obligation that survived the expiration of the 20-year contract and that it could not abandon without Commission approval.

The Court explained that the company's statutory obligation was not limited to the contractual commitment it had voluntarily assumed. "[T]he service in which the producer engages [the sale of natural gas] is distinct from the contract which regulates his relationship with the transmission company in performing the service." 364 U. S., at 153. The duty to continue that service is an obligation imposed by the Act, not by contract. *Id.*, at 155.[15]

And later in the opinion the Court added:

"An initial application of an independent producer, to make movements of natural gas in interstate commerce, leads to a certificate of public convenience and necessity under which the Commission controls the basis on which 'gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval. The gas operator, although to this extent a captive subject to the jurisdiction of the Commission, is not without remedy to protect himself.' [*Atlantic Refining Co.* v. *Public Serv. Comm'n of New York*,] 360 U. S., at 389." *Id.*, at 156.

---

[15] The Court's statement was made in response to the company's argument that *United Gas Pipe Line Co.* v. *Mobil Gas Service Corp.*, *supra*, established the principle that the Act preserved the integrity of private contracts, and that therefore the Commission should not be allowed to compel it to enlarge its contractual undertaking. The holding in *Mobil* was that the seller could not file for a rate increase that would violate the terms of his contract. In *Sunray*, however, no violation of an existing contract was required or permitted by the Commission.

The petitioners argue that like reasoning controls this case. Because the certificate issued to Gulf was not limited by the duration of its leasehold interests, they contend that respondents must supply leasehold gas to El Paso until they obtain permission to abandon that service pursuant to § 7 (b) of the Act. The argument misconceives the nature of the issue resolved by *Sunray*.

In *Sunray* the issue before the Court was whether a private contract between a producer and a pipeline company could supplant the Commission's authority to determine how long the producer's gas would be subject to interstate dedication. There was no question that the producer had dedicated the gas to the interstate market, and there was no question that the producer owned the gas that he had dedicated. In the case at hand, however, respondents have not themselves dedicated *any* gas to interstate commerce, and they strenuously urge that Gulf's power to dedicate their gas was limited by the character of Gulf's leasehold interest. The issue here, therefore, is one step removed from that in *Sunray*. Nevertheless petitioners claim that *Sunray* controls. Their "syllogism" is that since a private contract is not determinative of the scope of a dedication, a private lease should not be determinative of whether there has been a dedication. But the syllogism is a non sequitur.[16] Moreover, *Sunray* cannot, consistently with the purposes and structure of the Natural Gas Act, be expanded in this fashion.

The Natural Gas Act, as this Court has repeatedly stated, does not represent an exercise of Congress' full power under the Commerce Clause. See, *e. g., FPC* v. *Panhandle Eastern*

---

[16] The fact that Sunray's contract with its customers did not limit the *scope* of Sunray's dedication of its own gas does not logically compel any answer to the question *whether* Gulf had the power to dedicate gas owned by its lessors after the termination of the lease. See generally Conine & Niebrugge, Dedication under the Natural Gas Act: Extent and Escape, 30 Okla. L. Rev. 735, 821–825 (1977).

*Pipe Line Co.,* 337 U. S. 498, 502. Instead, § 1 (b) limits the Act's reach to interstate transportation and sales of natural gas, 15 U. S. C. § 717 (b) (1976 ed.), and this same restriction is reflected in the abandonment provision. Section 7 (b) provides that "[n]o *natural gas company* shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities . . . ." 15 U. S. C. § 717f (b) (1976 ed.) (emphasis added). "Natural gas company," in turn, is defined as "a person engaged in the transportation of natural gas in interstate commerce, or the *sale* in interstate commerce of such gas for resale." 15 U. S. C. § 717a (6) (1976 ed.) (emphasis added).

While Gulf, like the oil company in *Sunray,* is a "natural gas company" within this definition, it is clear that, at least prior to the lease termination, the respondents were not. They clearly did not transport gas, and their retention of a standard, fixed royalty interest did not constitute a "sale" of gas in interstate commerce.[17] This latter point follows from the rule that the royalty provisions of an oil and gas lease are not subject to the Natural Gas Act. *Mobil Oil Corp.* v. *FPC,* 149 U. S. App. D. C. 310, 463 F. 2d 256 (1972), cert. denied *sub nom. Mobil Oil Corp.* v. *Matzen,* 406 U. S. 976. The reasoning of the Court of Appeals in that case is applicable here:

> "When we come to an ordinary lease by the landowner to the producer there is neither a 'customary' sale in interstate commerce nor its equivalent in economic effect. Such a lease is a transaction that is itself customary and conventional, but one that precedes the 'conventional' sales in interstate commerce with which Congress was concerned, indeed even precedes the 'production and gathering' which § 1 (b) visualized as preceding the sale

---

[17] Of course, the sale at issue is the alleged sale in this case; it is irrelevant that some of the respondents may have sold natural gas from other fields under other contracts in interstate commerce for resale.

in interstate commerce over which jurisdiction was being established.

. . . . .

"The FPC is limited by the provision establishing its jurisdiction, and we do not find in that provision, rooted as it is in a sale in interstate commerce, any basis for reaching out to cover the landowner's lease or its royalty payments." [18]

The Commission does not challenge this rule; instead, it argues that "lessors who succeed to the interest of their natural gas company lessees would be natural gas companies within the meaning of the Act." Brief for Petitioner in No. 76–1587, p. 29. But neither the Commission nor any court has held that a lessor succeeds to the interest of his lessee when a lease expires by its terms. The Commission has held that a purchaser or assignee charged with notice of the burdens imposed on the acquired estate by its former owner must seek abandonment approval under § 7 (b). See, e. g., *Cumberland Natural Gas Co.*, 34 F. P. C. 132 (1965). The Commission has reasoned that, in these situations, the successor-in-interest has "stepp[ed] into the shoes of his predecessor." *Graridge Corp.*, 30 F. P. C. 1156, 1162 (1963); see also *Phillips Petroleum Co.* v. *FPC*, 556 F. 2d 466 (CA10 1977); but see *El Paso Natural Gas Co.*, 48 F. P. C. 1269 (1972).

That analysis does not apply in this case. The character of the fee owner's reversionary interest was defined when the leasehold estate was created. Respondents did not "step into" Gulf's leasehold interest; that interest expired. This is, of

---

[18] 149 U. S. App. D. C., at 316–317, 463 F. 2d, at 262–263. As the District of Columbia Circuit correctly observed, the issue is the extent to which royalty payments under a lease are related to the concept of a jurisdictional "sale" under the Act. An entirely different analysis might be appropriate if the lessee or lessor sought to abandon permanent facilities for the interstate transportation of gas, such as a pipeline.

course, merely another way of expressing the well-settled doctrine of property law that "one having a limited estate in land cannot, as against the person entitled in reversion or remainder, create an estate to endure beyond the normal time for termination of his own estate." 1 H. Tiffany, Law of Real Property § 153, p. 247 (3d ed. 1939).[19]

Petitioners rejoin that strict concepts of property law or state definitions of ownership cannot control the scope of the federal Act. But this proposition, though valid, does not support petitioners' position. As the Court has previously stated, "[a] regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law," *United Gas Improvement Co.* v. *Continental Oil Co.*, 381 U. S. 392, 400, and the Court must instead look to the economic reality of the transaction. But in this case respondents, as royalty owners, had "no control over any incident of such [gas] sale either as to the quantity to be sold, the price to be paid, the identity of the purchaser or whether it [should] be sold in interstate or intrastate commerce." *Mobil Oil Corp.* v. *FPC, supra,* at 316, 463 F. 2d, at 262. There is no claim that the lease was terminated prematurely in order to withdraw the gas from the interstate market or to evade the Commission's ratemaking authority. And, in fact, this case does not even present the specter of evasion or bad faith since the lease was negotiated at arm's length and executed years before the statute was passed.

My conclusion that Congress did not intend to allow a lessee to dedicate a lessor's gas in this situation is supported not

---

[19] Petitioners argue that, since Gulf had the right to extract *all* the natural gas from the leased land, the respondents are, in effect, stepping into the remainder of a burdened interest. This argument is based on a highly selective reading of the lease agreement which simply ignores the express limitation placed on that right to extract "all" the gas. Gulf only had the right to produce and market the gas it found, developed, and sold during the specified 50-year term. See *Southland Royalty Co.* v. *FPC,* 543 F. 2d, at 1137–1138.

only by the statutory provisions discussed above, but also by the legislative history which clearly counsels restraint in judicial interpretation of the Act. Both the House and Senate Reports state that the Act only "provides for regulation along recognized and more or less standardized lines. There is nothing novel in its provisions, and it is believed that no constitutional question is presented." H. R. Rep. No. 709, 75th Cong., 1st Sess., 3 (1937); S. Rep. No. 1162, 75th Cong., 1st Sess., 3 (1937). I cannot believe that, in a statute described as containing "nothing novel," Congress intended to allow a natural gas company, operating under a fixed-term lease, to impose a permanent service burden on the royalty owner over that party's objection.

## II

Based on the preceding analysis, it is apparent that this Court's railroad abandonment cases do not support petitioners. They rely on *Smith* v. *Hoboken R., Warehouse & S. S. Connecting Co.*, 328 U. S. 123, and *Thompson* v. *Texas Mexican R. Co.*, 328 U. S. 134, two companion cases decided in 1946, in which the Court held that § 1 (18) of the Interstate Commerce Act [20] required Commission approval of the abandonment of the lessee's operations and the lessor had standing to seek that approval.[21] These cases make it clear that a lessee's statutory

---

[20] "Section 1 (18) provides in part:

"[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." 49 U. S. C. § 1 (18).

[21] In both cases the Court relied on the alternative ground that the lessee was the debtor in a reorganization proceeding in which § 77 of the Bankruptcy Act required the Commission to prepare the plan of reorganization. See *Hoboken*, 328 U. S., at 130–133; *Thompson*, 328 U. S., at 142–144. In the *Thompson* case, which involved a trackage agreement, the Court also relied on the Commission's jurisdiction under § 5 (2) (a) of

duty to continue operations until a regulatory commission has given its approval to a proposed abandonment may qualify the contractual rights of the lessor. The cases do not, however, shed any light on the question whether a regulated lessee may impose any statutory duties on an unregulated lessor.

The railroad cases did not involve any question concerning the scope of the dedication to interstate commerce, or any attempt to impose an obligation on a party which was not subject to the Commission's jurisdiction. The question was *which* of the two companies subject to the jurisdiction of the Commission should operate—not *whether* the operation should continue. Neither the lessor nor the lessee wanted to have the regulated operation cease; both recognized that the common carrier's obligation to provide service to the public existed independently of the lease and survived its termination. In short, in neither case was there any question but that the lessor was a "common carrier" under the Interstate Commerce Act and subject to the obligations imposed by the Act.

The importance of this distinction is highlighted by subsequent lower court cases interpreting the railroad abandonment provision of § 1 (18). In particular, the Court of Appeals for the Second Circuit has concluded that *Hoboken* and *Thompson* do not "hold or imply that a noncarrier, by merely leasing its properties to a carrier, becomes a 'carrier by railroad,' thus subjecting itself to an obligation to carry on the operations of its lessee's railroad . . . ." *Meyers* v. *Famous Realty, Inc.*, 271 F. 2d 811, 814 (1959), cert. denied, 362 U. S. 910; [22]

the Interstate Commerce Act to fix the terms and conditions, including rentals, for any trackage agreements created after the effective date of the Transportation Act of 1940. See 328 U. S., at 146–150.

[22] The Commission points out that in *Meyers* the lessee had previously obtained abandonment authorization from the Interstate Commerce Commission. The Second Circuit did not, however, rely on that fact, see 271 F. 2d, at 814, and, in any event, I fail to see how that distinction sup-

see also *City of New York* v. *United States,* 337 F. Supp. 150, 153 (EDNY 1972) (three-judge panel); Friendly, Amendment of the Railroad Reorganization Act, 36 Colum. L. Rev. 27, 47–49 (1936). Thus, instead of supporting the petitioners' position in this case, the cases dealing with railroad abandonment merely illustrate the extent to which petitioners' claim is unprecedented.

## III

Finally, petitioners argue that the Court of Appeals' ruling should be reversed in order to prevent parties from diverting natural gas production from the interstate market at will. The answer to this contention is implicit in the discussion of *Sunray* and the Natural Gas Act, Part I, *supra,* but I will address it separately because this Court has long recognized that one of the central purposes of the Act is "to protect consumers against exploitation at the hands of natural gas companies." *FPC* v. *Hope Gas Co.,* 320 U. S. 591, 610. The Commission argues that unless abandonment authorization is required in this case, the natural gas companies will be able to manipulate and restructure their leases to avoid the Commission's ratemaking authority. There are three answers to this concern.

First, there are few short-term development leases in existence. The magnitude of the capital investment required for exploration and development of oil and gas production makes it extremely unattractive for any natural gas company to accept a short-term production lease. Indeed, the literature

---

ports the Commission's theory in this case, since it argues that the gas supply itself was dedicated to interstate commerce. Furthermore, it should be noted that Gulf did apply for abandonment authorization, an application which the Commission staff considered "superfluous." 54 F. P. C., at 151, 10 P. U. R. 4th, at 349. The Commission ruled that the application was appropriate on the ground that "[w]e should have all the significant parties before us . . . ." *Ibid.* The question whether Gulf was under a duty to request abandonment approval is not before us.

indicates that the fixed-term leases involved in this case are an almost extinct species, and that development leases typically survive for as long as production is economically feasible.[23]

Second, nothing in the Fifth Circuit's decision affects the Commission's power to require future applicants for certificates to describe the details of their supply arrangements and to withhold approval pending the receipt of appropriate evidence of consent to an unlimited dedication by all interested parties. See *Sunray Mid-Continent Oil Co.* v. *FPC,* 364 U. S. 137.[24]

Finally, the decision of the Fifth Circuit does not in any way allow natural gas companies to exercise an "unregulated choice" over whether to continue serving the interstate market. See *FPC* v. *Moss,* 424 U. S. 494, 506 (BURGER, C. J., concurring in judgment). The Commission's error in this case was its conclusion that the need to obtain abandonment authorization was "like an ancient covenant running with the land," *El Paso Natural Gas Co.,* 54 F. P. C. 145, 150, 10 P. U. R. 4th 344, 348 (1975), which enabled a lessee for a limited term to impose

---

[23] See 3 H. Williams, Oil and Gas Law § 601.1 (1977); Walker, The Nature of the Property Interests Created by an Oil Gas Lease in Texas, 7 Texas L. Rev. 1 (1928).

[24] Contrary to the Court's suggestion, this case has nothing whatsoever to do with the question in *Sunray* of "whether the conditioning power could be used to achieve indirectly what the Act did not authorize the Commission to do directly." *Ante,* at 530. In *Sunray* petitioner argued that the Commission could *only* approve what the applicant itself proposed. The Court rejected that argument. It then observed in passing that if it had accepted petitioner's position, the Commission could probably not have used its "conditioning" power to award a certificate of longer duration than that prayed for, since that would simply allow the Commission to accomplish indirectly what it could not accomplish directly.

No one questions in this case the Commission's *direct* power to withhold a certificate pending receipt of evidence that the applicant has the power to make an unlimited dedication. Indeed, no one has ever suggested that that might be an issue. *Sunray's* observation with respect to indirect power is, therefore, simply irrelevant.

a burden on the lessor's interest after the expiration of the lease. As both the language and history of the Act show, Congress did not intend to work such a revolution in property interests touching natural gas. It confined the applicability of the abandonment provisions to "natural gas companies." But that term is sufficiently flexible to enable the Commission to analyze the economic and practical significance of transfers of interests in natural gas regardless of the particular label applied to any transfer. See *United Gas Improvement Co.* v. *Continental Oil Co.,* 381 U. S. 392.[25] The Commission has ample authority to prevent manipulation of the Act's regulatory provisions.

Despite the Act's flexibility, I would not stretch it to reach this case. The lessors, as royalty owners, had no control over the interstate sales, and even with the lease running without interruption, the lessee's interest was limited to a 50-year term. There is no authority in the statute for imposing a permanent service obligation on the lessors in this situation. Accordingly I would affirm the decision of the Court of Appeals.

---

[25] In *United Gas Improvement,* producers of gas had long-term sales contracts with an interstate pipeline. After the *Phillips* decision, see *supra,* at 535–536, the parties withdrew their sales contracts and entered into lease arrangements which substantially preserved the terms of the prior contracts. The Court held that these transactions, however characterized by the parties, amounted to "sales" under the Act. Similarly, parties to a contract cannot avoid the Commission's jurisdiction simply by stating that their sale of natural gas in interstate commerce " 'is not subject to the jurisdiction of the Federal Power Commission.' " See *California* v. *Lo-Vaca Co.,* 379 U. S. 366, 367–368.