PUBLIC SERVICE COMPANY OF NORTH CAROLINA, INC., State of Texas, State of Louisiana, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of Alaska, State of New Mexico Energy Resources Board, Public Service Commission of the State of New York, Natural Gas Pipeline Company of America, Intervenors.

Nos. 77-2728, 77-2746 and 77-2807.

United States Court of Appeals, Fifth Circuit.

Jan. 11, 1979.

Rehearing Denied Feb. 8, 1979.

R. Gordon Gooch, Bruce F. Kiely, Randolph Q. McManus, Washington, D. C., F. Kent Burns, Raleigh, N. C., for petitioner Public Service Co. of North Carolina, Inc.

John L. Hill, Atty. Gen. of Tex., David M. Kendall, First Asst. Atty. Gen., Austen H. Furse, Asst. Atty. Gen., Austin, Tex., for petitioner State of Texas.

James R. Patton, Jr., Harry E. Barsch, Linda Elizabeth Buck, David Robinson, Washington, D. C., for petitioner State of Louisiana.

Robert M. Maynard, Asst. Atty. Gen., State of Alaska, Dept. of Law, Avrum M. Gross, Atty. Gen., Juneau, Alaska, Cynthia L. Pickering, Asst. Atty. Gen., Anchorage, Alaska, for State of Alaska, intervenors objecting.

Vernon O. Henning, Asst. Atty. Gen., Toney Anaya, Atty. Gen., Santa Fe, N. M., for Energy Resources Board of State of New Mexico, intervenor objecting.

Robert R. Nordhaus, Gen. Counsel, F. E. R. C., Philip Telleen, Steven Taube, Attys., F. E. R. C., Howard E. Shapiro, Sol., Washington, D. C., for respondent.

Arthur S. Kallow, Chicago, Ill., for Natural Gas Pipeline Co. of America, intervenors supporting.

Peter H. Schiff, Gen. Counsel, P. S. C. of State of N. Y., Albany, N. Y., Richard A. Solomon, Dennis Lane, Washington, D. C., for Public Service Comm. of State of N. Y., intervenor supporting.

Joseph M. Wells, Paul E. Goldstein, Richard E. Terry, Chicago, Ill., for Nat. Gas Pipeline, intervenor supporting.

Before BROWN, Chief Judge, GODBOLD * and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This case presents the question whether a state, which is not a "natural gas company" under the Natural Gas Act (the Act), may nevertheless be made subject to the abandonment provisions of § 7(b) of the Act.[1] We conclude that where the state has consented to the interstate dedication of its gas, the state must obtain FERC approval prior to abandoning the certificated service.

I.

Much of Texas's public education system is financed from revenues received through the issuance of state oil and gas leases to producers, who then remit a royalty to the state.[2] In the case before us, in May, 1970, Texas, acting through its agency the School Land Board of Texas,[3] followed this scheme by issuing to Superior Oil Company (Superior) gas leases covering state-owned land.[4] In turn, Texas retained a royalty interest that could be taken either "for value" or "in kind.[5]" Pursuant to a 1971 Federal Power Commission certificate obtained by Superi-

---

* Judge Godbold did not participate in the final decision. Pursuant to 28 U.S.C.A. § 46(d), the decision is rendered by a quorum.

1. Section 7(b) of the Natural Gas Act, 15 U.S. C.A. § 717f(b), provides as follows:

   (b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

2. See Vernon's Tex.Civ.Stat. art. 5421c.

3. We will use the term "Texas" to encompass both the state and its agency, the School Land Board, there being no significant legal distinction between the two entities.

4. Three leases were eventually issued by Texas to Superior. Only the first two of these leases are involved in this case.

5. The original leases between Superior and Texas did not provide for Texas's taking the gas in kind. In January, 1974, however, the parties amended their agreements so as to recognize Texas's right to take its royalty in kind.

or,[6] all the gas produced by Superior, both its own and that attributable to Texas's royalty share, was then sold in interstate commerce to Natural Gas Pipeline Company (Natural).

For several years, Texas received its royalty share in money. Then, on April 25, 1975, after the leases had been amended so as to permit the taking of royalties in kind,[7] Texas elected to take in kind. Shortly thereafter, Texas entered into an agreement to sell its royalty share to Public Service Company of North Carolina (Public Service), a natural gas distribution company. Upon learning of this contemplated transaction, the Commission informed the parties that Texas's royalty gas could not be diverted from Natural to Public Service without prior abandonment authorization from the agency.

■ Public Service then petitioned the Commission for an order declaring that the Commission had no jurisdiction to require abandonment authorization prior to Texas's taking its royalty gas in kind. In its Declaratory Order, the Commission concluded that, although neither Texas nor its agency was a "natural gas company" within the meaning of the Act,[8] both Texas *and* Superior were required to seek abandonment authorization—Superior, because it had

dedicated the gas reserves to interstate commerce, and Texas, because it had acquiesced in this dedication:

[T]he reserves covered by . . . the first two leases were dedicated to interstate commerce when Superior made the sale to Natural. A certificate was issued . . . and gas was delivered. Texas did not object to this course of business until . . . it notified the Commission of its intention to take the royalty gas in kind. Once dedicated, the reserves remained dedicated and this is the result distinct from the underlying contractual arrangement.

\* \* \* \* \* \*

Under the facts here, particularly the acquiescence of Texas in the interstate course of business we conclude therefore that, before Texas' royalty gas from the first two leases can be withdrawn from sale to Natural and transported and delivered to Public Service, Texas, or its agency, and Superior must obtain abandonment authority under Section 7(b) of the Natural Gas Act.[9]

Public Service unsuccessfully challenged the Commission's Order in administrative proceedings and now brings its Petition for Review in this Court.[10]

**6.** In the course of this litigation, the Federal Power Commission became the Federal Energy Regulatory Commission. Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (August 4, 1977); Executive Order No. 12009, 42 Fed.Reg. 46267 (September 13, 1977). The new nomenclature makes no difference to the outcome of this case. So, to avoid any confusion we will hereinafter refer to the federal energy agency merely as "the Commission," a term that encompasses either the FPC or FERC, as applicable.

The certificate referred to in the text is, of course, the "certificate of public convenience and necessity" required under § 7(c) of the Act. 15 U.S.C.A. § 717f(c).

**7.** See note 5, *supra.*

**8.** The Commission observed that although the definitions of § 2 of the Natural Gas Act did not specifically exclude a state as a "natural gas company," they did exclude state agencies. See 15 U.S.C.A. § 717a(1)–(3), (6). Since state agencies were expressly excluded from the def-

inition of a "natural gas company," and since there was no legal distinction between a state and the agency through which it acts, the Commission reasoned that the state, as well as its agent, was excluded from the definition of a "natural gas company." Public Service Company of North Carolina, Inc., Declaratory Order on Jurisdiction Over State Activities and on Necessity for Abandonment Authorization, Docket No. RP76–103 (April 26, 1977) [hereinafter cited as Declaratory Order], at 4–5. We conclude that in this respect the Commission was correct.

**9.** Declaratory Order, note 8, *supra*, at 8, 10.

**10.** Also before this Court as petitioners are the states of Texas and Louisiana. In addition, the state of Alaska, the New Mexico Energy Resources Board, the Public Service Commission of New York, and Natural have joined the proceedings as intervenors.

## II.

Petitioners' main contention is that since a state is not, and never can be, a "natural gas company" under the Act, the Commission cannot require the state to seek abandonment authorization under § 7(b) of the Act, a section that is specifically limited to "natural gas companies." Moreover, petitioners argue, since a state cannot directly come within the ambit of § 7(b), the same result cannot be achieved indirectly by requiring Superior to seek abandonment authorization.[11]

As logical and as consistent with the statutory language as petitioners' argument might appear, we must nevertheless conclude that their position cannot be upheld. Our reading of the recent Supreme Court decision in *California v. Southland Royalty Company*, 1978, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505, leads us to conclude that an entity's status as a "natural gas company" is largely irrelevant to the question of whether that entity must seek abandonment authorization under § 7(b). As we see it, *Southland* establishes the principle that any party, whether a "natural gas company" or not, that acquiesces in the "dedication" of its gas to interstate commerce becomes obligated to continue the dedicated service or seek Commission approval to abandon it.

In *Southland*, Gulf acquired a 50-year leasehold interest in certain oil and gas reserves, with Southland and others retaining a reversionary interest in those reserves. As authorized by the terms of its lease, Gulf arranged to sell the production in interstate commerce. Accordingly, Gulf obtained a Commission certificate of unlimited duration and proceeded to transmit gas through the interstate market. Later, upon expiration of its lease, Gulf's interest in the reserves went to Southland and the other owners of the reversionary interest. These owners then sought to make an intrastate sale of the remaining gas reserves. Despite the fact that Gulf, a tenant for a term of years, had under Texas law no legal rights over the gas remaining after the termination of the lease, the Court determined that the lessee Gulf had, with the owners' approval, "dedicated" all the reserves to interstate commerce by transporting the gas in the interstate market subject to a certificate of unlimited duration:

> This issuance of a certificate of unlimited duration covering the gas at issue here created a federal obligation to serve the interstate market until abandonment had been obtained. The Commission reasonably concluded that under the statute the obligation to continue service attached to the gas, not as a matter of contract but as a matter of law, and bound all those with dominion and power of sale over the gas, including the lessor to whom it reverted. [T]he service obligation imposed by the Commission survived the expiration of the private agreement which gave rise to the Commission's jurisdiction.

*Id.* at 526, 98 S.Ct. at 1959. Once this gas was so dedicated, the Court held, the owners could not divert it from interstate commerce without first seeking Commission authorization under § 7(b) of the Act.

The facts of the case before us are clearly analogous to those of *Southland*. Texas fully acquiesced in Superior's interstate transmission of *all* the production to Natural. Texas never objected to Superior's obtaining a certificate covering *all* the gas, and indeed, Texas profited from Superior's interstate dedication of the gas by accepting royalty payments based on the interstate sales of its gas. Thus, to paraphrase the Court in *Southland*, Texas, having consented to Superior's interstate sales of gas, cannot now object to the rules and restrictions that accompany such sales. *Cf. id.* at 528–29, 98 S.Ct. at 1960.

Petitioners seek to distinguish the instant case from *Southland* on the grounds that the owners of the reversionary interest in *Southland* could become "natural gas companies," while Texas can never achieve this

11. Since we find that the Commission can directly require Texas to seek abandonment, we need not consider Texas's argument that such could not be done indirectly through Superior.

status. This may well be true. The argument, however, overlooks the major point of *Southland*—that it is the *dedication* of the gas that creates the service obligation. Indeed, in *Southland*, the Court refused to reach the question of whether the owners were "natural gas companies." Instead, the Court pointed out that whether or not the owners were "natural gas companies" was "somewhat beside the point, for the obligation to serve the interstate market had already attached to the *gas*, and respondents became obligated to continue that service when they assumed control of the gas." *Id.* at 528, 98 S.Ct. at 1960. Thus, the fact that Texas can never become a "natural gas company" is irrelevant once Texas has allowed its gas to be dedicated to interstate service.[12]

Petitioners also seek exemption from the abandonment requirement on the grounds that Superior did not have the legal authority to dedicate Texas's royalty gas, gas that Superior did not own. This argument was, however, handily disposed of in *Southland*, where the owners challenged Gulf's legal authority to dedicate their gas. Admitting the "appealing resonance" of the maxim that " 'no man can dedicate what he does not own,' " the Court concluded that indeed he could. *Id.* at 527, 98 S.Ct. at 1960. Dedication is not a matter of a lessee's giving away or selling gas that it does not own, the Court explained, but rather a matter of changing the regulatory status of that gas. Superior's consented-to acquisition of the interstate certificate is effective to dedicate Texas's gas whatever the parties' relationship might be under local law.

We emphasize, however, that in our holding today we are deciding only the fate of royalty-owning states that seek to abandon interstate service after having consented to interstate transmission of gas pursuant to a Commission certificate issued to a natural gas company. Although the Commission stated in its Order that a state agency or state might be subject to the Natural Gas Act "where the context so requires," we expressly limit our holding to cover only the facts before us today. We do not decide what consequences would flow from the transmission of a state's gas without Commission authorization or without the state's acquiescence. Nor do we decide what results would obtain where the state itself initially sells directly in interstate commerce.[13] Instead, we repeat that it is the convergence of three factors—(1) interstate transmission by a natural gas company, (2) Commission certification, and (3) the state's acquiescence in (1) and (2) that gives rise to a continued service obligation.

### III.

Although we find that most of the contentions raised by petitioners have been answered in *Southland*, there is one element of this case that distinguishes it from the prior decision. That distinction stems from Texas's special status as a sovereign state of the Union.

■ Petitioners contend that the Commission's attempt to regulate state-owned gas amounts to an unconstitutional intrusion on state sovereignty.[14] As support for

---

**12.** Because it is the *fact* of dedication that is decisive, it is also irrelevant whether Texas could or could not take its royalty in kind from the inception of the contract with Superior. The existence of an *unexercised* right to take in kind has no consequence.

**13.** We observe that at oral argument, the attorney for the Commission conceded that Texas could directly sell its gas in interstate commerce without the necessity of a certificate and could later terminate its direct sales without the necessity of seeking abandonment authorization.

**14.** Before the Commission, intervenor New Mexico also contended that the Commission's action violated the "equal footing doctrine," in light of § 13(b) of the Alaska Natural Gas Transportation Act of 1976, 15 U.S.C.A. § 719k(b), which requires the Commission to approve Alaska's withdrawals of dedicated gas for use within Alaska. The argument was that the Commission's action unconstitutionally subjected Texas to disparate treatment from that afforded Alaska. See Declaratory Order, note 8, *supra*, at 7, 10. This argument was not raised on appeal, and we do not consider it today.

this proposition, petitioners cite the Supreme Court decision in *National League of Cities v. Usery*, 1976, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245. There, the Court ruled that Congress could not constitutionally extend provisions of the Fair Labor Standards Act to cover state and local employees: "[I]nsofar as the challenged [provisions] operate to *directly displace* the States' freedom to structure *integral operations* in *areas of traditional governmental functions,* they are not within the authority granted Congress by Art. I, § 8, cl. 3." *Id.* at 852, 96 S.Ct. at 2474 (emphasis added).

In this case, however, Texas's activities do not come under the protective mantle of *National League of Cities.* Texas's oil and gas business is not a "traditional governmental function" of the sort described by the Court in *National League of Cities.*[15] Instead, the business engaged in by Texas is an operation indistinguishable from like commercial activities of private business. It is precisely this sort of state activity that may be subject to federal regulation. *See id.* at 854 n. 18, 96 S.Ct. 2465.[16]

Moreover, it cannot be said that federal regulation here will "directly displace" a traditional governmental function. Commission regulation may well affect the amount of revenues received by the school fund. This indirect effect, however, comes nowhere near constituting a federal usurpation of state control over public education in Texas.

Finally, we find helpful the balancing approach suggested by Justice Blackmun, who provided the "swing vote" in *National League of Cities,* 426 U.S. at 856, 96 S.Ct. 2465 (Blackmun, J., concurring). In applying that test here, we have determined that the important federal interest in securing a continuous supply of natural gas in interstate markets outweighs the incidental effect that Commission regulation might have on the school children of Texas.

Accordingly, because we find that Texas permitted the interstate dedication of its gas, and because the state activity in question here is properly subject to federal regulation, we hold that the Commission correctly concluded that Texas must seek abandonment authorization prior to withdrawing its gas from service to Natural.

ENFORCED.

---

Although the constitutional argument was abandoned on appeal, Texas did rely on § 719k(b) as an indication of congressional policy favoring the right of all states "to dispose freely" of their royalty gas. Brief for Petitioner the State of Texas, at 15. From our reading of the Alaska Natural Gas Transportation Act and its legislative history, we do not find sufficient support for this interpretation that goes beyond the clear language of the statute.

**15.** As examples of traditional functions of state and local governments, the Court cited police and fire protection, sanitation, public health, and parks and recreation. 426 U.S. at 851, 96 S.Ct. at 2474.

**16.** The Court sanctioned this principle by approving its prior holding in *United States v.*

*California,* 1936, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567. In that case, the Court determined that a state-owned railroad operating in interstate commerce was subject to the federal Safety Appliance Act: "California, by engaging in interstate commerce by rail, has subjected itself to the commerce power, and is liable for a violation of the Safety Appliance Act, as are other carriers . . . ." *Id.* at 185, 56 S.Ct. at 424. *See also Parden v. Terminal Railway of the Alabama State Docks Department,* 1964, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (state's operation of railroad in interstate commerce constitutes waiver of sovereign immunity in suit brought under the Federal Employers' Liability Act).