SOUTHLAND ROYALTY COMPANY et al., Texaco Inc., Exxon Corporation, and Mobil Oil Corporation, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent.

Nos. 75–3373, 75–2851, 75–3682, 75–3819 and 75–4001.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1976.

9. Brief for Appellant at 33.

J. Evans Attwell, Henry S. May, Jr., Houston, Tex., for petitioner in No. 75–3373.

J. Evans Attwell, P. M. Schenkkan, Travis C. Broesche, Houston, Tex., Ernest E. Smith, III, Austin, Tex., Platt W. Davis, III, Washington, D. C., for Southland Royalty Co.

Kirk W. Weinert, Roger L. Brandt, C. Fielding Early, Jr., Houston, Tex., for Texaco, Inc.

Sherman S. Poland, Bernard A. Foster, III, Martin N. Erck, Douglas E. Mock, Houston, Tex., for Exxon Corp.

Robert D. Haworth, Houston, Tex., for Mobil Oil.

C. Frank Reifsnyder, Washington, D. C., Richard S. Morris, Asst. Gen. Counsel, Harris S. Wood, Atty., El Paso, Tex., G. Scott Cuming, Gen. Counsel, Houston, Tex., for El Paso Natural Gas Co.

Randolph W. Deutsch, J. Calvin Simpson, Richard D. Gravelle, San Francisco, Cal., for People & Public Utilities Comm. of State of Cal.

Jeffrey A. Meith, Los Angeles, Cal., for Southern California Gas Co.

Malcolm H. Furbush, San Francisco, Cal., Harris S. Wood, El Paso, Tex., for Pacific Gas & Elec. Co.

John Davenport, Austin, Tex., for Texas Independent Producers, etc.

Thomas W. Derryberry, Asst. Atty. Gen., William O. Jordan, Santa Fe, N. M., for State of N. M.

William P. Pannill, F. H. Pannill, Houston, Tex., for Crane City Development Co.

J. Milton Richardson, Asst. Atty. Gen., Austin, Tex., amicus curiae for State of Tex.

James E. Williams, Lake Charles, La., amicus curiae, for Commissioner of Conservation of La., etc.

Paul E. DeGraffenreid, Atty., Commissioners of the Land Office, State of Okl., Oklahoma City, Okl., amicus curiae, for State of Okl. ex rel. Comm. of the Land Office.

Robert W. Perdue, Deputy Gen. Counsel, Steven A. Taube, Douglas L. Corbett, Attys., Drexel D. Journey, Gen. Counsel, Allan A. Tuttle, Sol., F.P.C., Washington, D. C., for respondent.

Martin N. Erck, Paul W. Wright, Houston, Tex., Sherman S. Poland, Bernard A. Foster, Jr., Ralph C. Oser, Washington, D. C., for petitioner in No. 75–3819.

Before CLARK, RONEY and TJOFLAT, Circuit Judges.

CLARK, Circuit Judge:

Unprecedented escalations in the price of energy have stunned public, industry and engineers of federal regulatory process alike. The gross imbalance between controlled prices at which interstate natural gas must be sold[1] and the substantially higher values set by the free market for gas

1. While this opinion was in preparation, the Federal Power Commission announced a dramatic increase in regulated natural gas prices which substantially eliminated this price gap.

and other fuels has created a sunburst of unique regulatory issues. Today's case is one such ray. Southland Royalty Co., and others,[2] (Southland) challenge opinions of the Federal Power Commission (FPC) which held that natural gas which Southland now owns in fee under a leasehold reversionary interest had been dedicated to interstate commerce by the lessee of the property. The challenge presents this significant property rights vs. regulatory powers issue: Does the lessee under a 50-year fixed-term mineral lease, by making certificated sales of leasehold natural gas in interstate commerce, thereby dedicate to interstate commerce the gas which remains in the ground at the end of the 50th year? The FPC answered affirmatively. We reverse.

Two different leases are involved in the present case. Gulf Oil Corp. (Gulf) entered into a 50-year fixed-term lease on July 14, 1925, with W. N. Waddell. This lease covered approximately 46,000 acres in Crane County, Texas. Southland is the successor in title to the Waddell reversionary interest. After *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), Gulf received a certificate of public convenience and necessity from the FPC which authorized the sale of surplus residue gas under its lease in interstate commerce to El Paso Natural Gas Co. (El Paso).[3] A separate certificate was issued after Gulf and El Paso entered into a second contract in 1972 for the sale of further volumes of surplus residue gas. At no time was Southland a party to these contracts or the certification; the only interest which Southland held was the right to receive a royalty on the gas sold. Shortly prior to the end of Gulf's 50-year term, Southland contracted with the operator of an intrastate natural gas pipeline, Intratex Gas Company, for the future disposal of the gas covered by Southland's reversionary interest.

A similar 50-year fixed-term lease was executed August 7, 1925, between Gulf as lessee and Goldsmith and others as lessors. This lease covered approximately 20,000 acres in Ector County, Texas. In 1929 Texaco, Inc., acquired a one-fourth interest in the Goldsmith reversion. Southland also has a fractional interest in the reversion in the Ector County properties, as do other parties. The lessee, Gulf, made the same sort of unqualified interstate dedication of the natural gas being produced from this lease.

El Paso petitioned the FPC for a declaratory order establishing that Southland could not sell its gas in the intrastate market without first seeking FPC approval through abandonment procedures. 15 U.S.C. § 717f(b). Texaco also sought clarification of its position with regard to the Ector County properties, and its petition was consolidated with that filed by El Paso.

The FPC held that the reversioners could not remove the gas from the interstate market without FPC approval to abandon. The principal basis for its conclusion was the unqualified dedication by the initial lessees of the properties committed all of the leasehold gas including that which might become the property of reversioners to the interstate market. Alternatively, the FPC asserted that the acceptance of royalties from interstate gas sales of the lessees constituted ratification by the reversioners.

The FPC reasoned that this provision of Section 7(b) of the Natural Gas Act:

> No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any *service rendered* by means of such facilities, without the *permission and approval of the Commission* first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that

---

**2.** Southland Royalty Company has ownership of approximately 47% of the acreage involved; trustees under the will of Warren Wright have 25.7%; Exxon Corporation, 14%; and more than 100 others own lesser shares.

**3.** "Surplus residue gas," or casinghead gas, was the sole product sold by Gulf to El Paso. Gas-well gas from these properties was not dedicated to interstate commerce and has instead remained in the intrastate market.

the continuance of service is unwarranted, or that the present or future public convenience or necessity permits such abandonment. [15 U.S.C. § 717f(b) (Emphasis supplied by the Commission.)]

and this language from the Supreme Court's opinion in *Atlantic Refining Co. v. Public Service Commission [CATCO]*, 360 U.S. 378, 388–89, 79 S.Ct. 1246, 1253–54, 3 L.Ed.2d 1312 (1959):

> The [Natural Gas] Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges. . . Section 7(e) vests in the Commission control over the conditions under which gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval.

authorized the conclusion that once the lessee had made a dedication of gas from the leasehold, none of the gas under those lands could be removed from the interstate market unless the FPC authorized abandonment. That Gulf's ownership was always limited to the gas produced within a fixed 50-year term was held to be irrelevant.

■ Under applicable Texas law, Gulf's rights were those of a tenant for a term of years; its interest was a limited one which terminated completely when title reverted to Southland at the expiration of the 50-year term. It is black letter law that a person holding a present interest in real property which is limited in duration cannot create an estate which will extend beyond the term of his interest. 2 R. Powell, The Law of Real Property ¶ 247[1] (Rohan Ed. 1967). *See also, e. g.,* 1 H. Tiffany, The Law of Real Property § 153 (3d ed. 1939); 2 H. Williams & C. Meyers, Oil & Gas Law § 332 (1975). Since Gulf never was possessed of rights in the gas under the leasehold lands which could survive the termination of its 50-year lease, it never could create rights in a third person to that same gas. *Waddell v. Empire Drilling Co.,* 358 S.W.2d 221 (Tex.Civ.App.—Eastland 1962,

writ ref'd n. r. e.). The estates in the single tract are as separate as though they subsisted in separate parcels of land. Though it is unquestioned that Gulf's dedication covered all of the surplus residue gas it produced during its lease term, there likewise can be no question that, under well established concepts of property law, Gulf could not legally deal in or dedicate that portion of the gas which Southland might own upon termination of Gulf's estate. Indeed, the FPC does not attack this construction of Texas law. Rather, it emphasizes that (1) the extent of Gulf's rights during its 50-year term was unquantified; (2) under its presently vested leasehold estate, Gulf had the right to withdraw all of the natural gas under the lease land if it could; and (3) the interest of the reversioners was both future and contingent. Under this state of affairs, FPC asserts that Gulf was empowered to dedicate all lease gas to the interstate market.

■ Though the FPC attempts to distinguish it, the conclusion reached in the case of *El Paso Natural Gas Co. v. Perry R. Bass,* 48 F.P.C. 1269 (1972), is a compelling argument for our decision here. Bass contracted with Shell Oil Company to develop the gas under his property, retaining, however, a royalty interest and an option to convert his royalty interest into a one-half working interest. Under the contract, Shell had no right to sell any gas attributable to Bass's working interest. Shell's operations were certificated by the FPC for sales in interstate commerce to El Paso Natural Gas Company. Bass elected to convert his royalty to a working interest; El Paso sought a declaratory opinion from the FPC that Bass must proceed under the abandonment section of the Natural Gas Act as to his one-half working interest.[4] Responding to this contention, the FPC wrote:

> The thrust of El Paso's argument is that El Paso in some manner acquired a right to purchase that which Shell had no right to sell. We will not alter so the basic property rights of mineral interest own-

4. 15 U.S.C. 717f(b).

ers through the fiction of Section 7(b) application . . .. El Paso's rights to purchase gas from . . . [the well] can rise no higher than Shell's rights to sell that gas . . ..

The alleged distinction between the *Bass* situation and the present case, namely, that Bass retained a present interest while here Southland had a future interest, is a distinction without a difference. In neither instance can a lessee encumber that which it does not own. To the extent that Gulf's present interest in all of the natural gas is contingent upon its removal within 50 years, the right to dedicate that gas removed to interstate commerce is likewise contingent. Whatever gas is left under the lease lands at the end of 50 years is not Gulf's gas and, by the plain terms of the limited leasehold estate, never belonged to it from day one forward.

■ The FPC's position could be apropos to a situation in which the subsequent holder of rights in the minerals has acquired or "succeeded" to those rights from a former holder who encumbered the estate. In general, when a successor comes into possession of the estate, he acquires it with all of the burdens on the property which were validly created by his predecessor in interest.[5] The contrary is true where the initial owner of property creates a limited estate in another subject to a provision that the remainder of the rights in the land will revert to the original owner upon the expiration of time. Such a conveyance creates no right to encumber or restrict the reversionary estate.[6] The FPC's failure to appreciate these basic distinctions in property law[7] is the genesis of its error.

The FPC also relied on *Sunray Mid-Continent Oil Co. v. FPC,* 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960), in which the Supreme Court ruled that the request of Sunray for a limited 20-year certificate for sale in interstate commerce (based on Sunray's 20-year contract with the interstate pipeline company involved) did not restrict the FPC to issuance of such a limited certificate. The Court reasoned that when Sunray chose not to "avail itself of its undoubted right to stand firm on its own application, and reject the proffered certificate," it waived its right to deny the certificate's validity. Id. at 141, 80 S.Ct. at 1395. The Court pointed out that the certificate of public convenience and necessity contemplated by the act is not intended to relate to any specific sale contemplated by the parties. Instead, it is based on the service to be rendered—the movement of natural gas in interstate commerce. Thus, the contract between the pipeline company and Sunray was merely the arrangement under which Sunray commenced its service.

The FPC's reliance upon *Sunray* as authority here is misplaced. The Court did not require Sunray to dedicate to interstate markets oil or gas which it did not own. It enforced the statutory scheme without impairing any contractual right since at the end of its initial 20-year sale contract period Sunray (or its successors in title) would still be the legal owner of the leasehold mineral estate. Indeed, the Court clearly indicated that it contemplated the continuation of ownership of the commodity which was dedicated by its reference to Sunray's ability to effectuate delivery of the service as a prerequisite to certification. On the other hand, Gulf, in the present case, at all times lacked the legal ability to deliver any gas from Southland's property after the expiration of its limited 50-year term.

The FPC further contends that since the application by Gulf for a certificate to sell in interstate commerce did not mention its

---

5. *Hartel v. Dishman,* 135 Tex. 600, 145 S.W.2d 865 (1940); *Stevenson v. Clausel,* 437 S.W.2d 404 (Tex.Civ.App.—Houston [14th Dist.] 1969, no writ).

6. *First Nat. Bank v. Amarillo Nat. Bank,* 531 S.W.2d 905 (Tex.Civ.App.—Amarillo 1975); *Moore v. Kirgan,* 250 S.W.2d 759 (Tex.Civ.App.—El Paso 1952, no writ).

7. The Commission stated "[f]or the practical purposes of the Act it makes no difference whether the successors happen to be assignees, purchasers or reversionary interests." Opinion 737, July 11, 1975.

limited interest, Southland cannot contend that its reversion is not subject to FPC control. Under such a theory a present interest holder could bind his reversioner by taking actions that exceed the actor's rights. The FPC's position is that this invasion should be permitted and the reversioner "protected" by a cause of action in state court against the present interest holder for the wrong. The approach stands both logic and land law on their heads. It is fallacious to justify the creation of a wrong by demonstration that a remedy is possible. Under Texas law Gulf's 50-year lease interest did not authorize it to impose any limitation on the reversionary estate. Having no right, it equally lacked the power to encumber the reversion by actions in excess of those authorized by its grant.

We are not concerned in the present case with any possibility of apparent or implied authority. Gulf's lease was properly recorded on the public land records. Its 50-year term limitation was within the FPC's constructive, if not its actual, knowledge. The contention that a lack of information justified reliance by the FPC and the public that the dedication to interstate markets of this gas extended beyond the expiration of Gulf's lease term is an assertion supported by neither fact nor authority. Moreover, no mention of this contention before us was made in the FPC's opinion. *See, FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). We reject this argument on both substantive and procedural grounds.

■ Alternatively, the FPC argues that Southland ratified Gulf's improper dedication of all leasehold gas to interstate commerce by acceptance of royalty payments during the term of the leases. Ratification implies knowing choice.[8] By accepting royalties paid by Gulf during the term of its lease, the holders of the reversionary interest committed no action inconsistent with their reversionary rights. The sale of natural gas produced from the leaseholds within

the lease term was solely Gulf's prerogative. The holders of the reversion could not control its exercise further than to require payment of the proper contract royalty. By accepting that royalty, the petitioners received only that to which they were entitled under their lease. As we have held above, under Texas property law Gulf could not bind the reversionary estate by its actions. Thus, lessors could not have known it would be claimed that Gulf's dedication of its gas affected their reversionary interest.

The decision of the Federal Power Commission is

REVERSED.

---

8.  *Williams v. Thrasher,* 62 F.2d 944 (5th Cir. 1933); *Kunkel v. Kunkel,* 515 S.W.2d 941 (Tex. Civ.App.—Amarillo 1974, writ ref'd n. r. e.); *Yelderman v. McCarthy,* 474 S.W.2d 781 (Tex. Civ.App.—Houston [1st Dist.] 1971, writ ref'd n. r. e.).