**CITY OF FARMINGTON, NEW MEXICO, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Amoco Production Company, Amoco Gas Company, Intervenors.**

**No. 85–1680.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1986.

Decided June 16, 1987.

---

Charles F. Wheatley, Jr., with whom Philip B. Malter, Annapolis, Md., was on the brief, for petitioner.

Andrea Wolfman, Atty., F.E.R.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent.

J. Paul Douglas, Washington, D.C., for intervenor, Amoco Gas Company. Brian J. Heisler entered an appearance for Amoco Gas Company.

Kevin M. Sweeney was on the brief for intervenor, Amoco Production Company.

Before WALD, Chief Judge, WILLIAMS, Circuit Judge, and WILL,* Senior District Judge.

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

Opinion for the Court filed by Circuit Judge WILLIAMS.

Opinion concurring in part and dissenting in part filed by Chief Judge WALD.

WILLIAMS, Circuit Judge:

The City of Farmington, New Mexico petitions for review of an order of the Federal Energy Regulatory Commission. Farmington contends that the Commission has jurisdiction, pursuant to § 1(b) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717(b) (1982), over a sale to an end user (Farmington itself), merely because the gas has been commingled in the producer's gathering facilities with gas destined to be sold by the producer for resale in interstate commerce. If Farmington's theory were accepted, Farmington's supplier could not stop selling to Farmington, despite expiration of the sales contract, without securing Commission approval. We reject this claim.

Farmington further argues that a sale of gas from a local distribution company to a consumer is a "first sale" under § 2(21) of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3301(21) (1982), when the gas was produced by the local distribution company's affiliate. Contrary to the Commission, we believe it to be a first sale, but remand to the Commission for consideration of the regulatory options available under *Public Service Commission v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 325–27, 343 n. 24, 103 S.Ct. 3024, 3028–29, 3037 n. 24, 77 L.Ed.2d 668 (1983).

## I. BACKGROUND

From 1961 to 1981, under a 10-year contract that was later extended, Amoco Gas Company sold natural gas to the City of Farmington solely to fuel its electric generating facilities. To cover the Farmington contract, Amoco Gas contracted with its parent, Amoco Production Company, to purchase gas from the latter's Dakota Formation wells in New Mexico. Amoco Gas received the gas from Amoco Production's gathering system, dehydrated it, and then transported it a short distance to Farmington's pipeline.

For four of the 20 years covered by the Amoco Gas/Farmington contractual relationship (1968–1972), Amoco Production also sold some of the gas from the Dakota Formation wells to the El Paso Natural Gas Company, an interstate pipeline. Pursuant to an "Excess Gas Purchase Agreement," Amoco Production agreed to sell El Paso gas that was not needed for delivery to others or for lease operations. Amoco Production secured a certificate of public convenience and necessity from the Commission for the El Paso sales. The certificate specified that the sale to El Paso was a sale of excess gas. For purposes of this appeal, the parties stipulated that the gas sold to El Paso was produced from the same wells as, and was commingled in Amoco Production's gathering facilities with, the gas sold to Amoco Gas for Farmington.

In 1981, on the expiration of a 10-year renewal of the Amoco Gas/Farmington contract (plus a few days' extension by letter agreement), Amoco Gas ceased deliveries as a result of a pricing dispute. Farmington filed suit in the United States District Court for the District of New Mexico, *see City of Farmington v. Amoco Gas Co.*, 568 F.Supp. 1265 (D.N.M.1983), *aff'd*, 777 F.2d 554 (10th Cir.1985), alleging that Amoco Gas had overcharged Farmington and that it improperly abandoned service without the approval of the Commission as the NGA required. *See* NGA § 7(b), 15 U.S.C. § 717f(b) (1982). The district court issued a preliminary injunction, effective from January to April 1982, ordering Amoco Gas to resume deliveries to Farmington. *See* 568 F.Supp. at 1274. Over a year after dissolution of the injunction, the district court dismissed Farmington's NGA claim without prejudice to Farmington's right to present it to the Commission.

Farmington repaired to the Commission, asking it to order gas service resumed until such time as the Commission might authorize abandonment and to find that the gas sold under the preliminary injunction im-

permissibly exceeded the first-sale price ceilings of the NGPA.

■ The Commission rejected both of Farmington's assertions, *City of Farmington v. Amoco Gas Co.*, 31 F.E.R.C. ¶ 61,290 (1985), and denied Farmington's petition for rehearing, Order Denying Rehearing, No. GP84–20–001 (FERC Aug. 21, 1985). Farmington petitioned for review on both grounds.[1]

## II. NGA JURISDICTION

■ If Amoco Gas's sales to Farmington were within the Commission's jurisdiction, its termination of sales when the contract expired would require Commission abandonment approval. *See* NGA § 7(b), 15 U.S.C. § 717f(b) (1982).[2] Those sales would be jurisdictional under § 1(b) of the NGA only if they involved "the transportation of natural gas in interstate commerce ... [or] the sale in interstate commerce of natural gas for resale...." 15 U.S.C. § 717f(b).

Farmington makes no claim that the transportation of its gas was in interstate commerce. And regardless of any connection with interstate commerce, the sale from Amoco Gas to Farmington was clearly not for resale: it was exclusively for use by Farmington in the generation of electricity. On its face, therefore, the transaction appears unequivocally nonjurisdictional. Farmington's assertion to the contrary seems to depend on two links. First, it invokes *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), for the proposition that the sales of gas from Amoco Production to Amoco Gas were jurisdictional because that gas was commingled in Amoco Production's gathering facility with gas that was sold to El Paso for resale in interstate commerce. Second, the sale from Amoco Gas to Farmington was jurisdictional because it followed a jurisdictional sale.

In speaking of Farmington's theory, we use the word "seems" advisedly. So far as the second link is concerned, Farmington never really articulates a theory, despite vigorous challenge by the Commission and intervenor. We address the second link first, because its unsoundness is most clear.

In *Panhandle Eastern Pipe Line Co. v. Public Service Commission*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), the Supreme Court upheld the power of *states* to regulate sales by an interstate pipeline to industrial end users, and in so doing made clear that Congress meant exactly what it said in distinguishing in the NGA between sales for resale, on the one hand, and sales for use by the purchaser, on the other:

> The omission of any reference to ... direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act "shall not apply *to any other ... sale....*" ... Those words plainly mean that ... [d]irect sales for consumptive use of whatever sort were excluded.

> The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions

---

**1.** We reject the Commission's (and intervenor's) threshold argument that we lack jurisdiction to resolve the NGA issue because Farmington did not preserve it for judicial review by properly "urg[ing] [the objection] before the Commission in [its] application for rehearing," 15 U.S.C. § 717r(b). Farmington's assertion that the Commission's decision flew "in the face of both the letter and the spirit of the Supreme Court's *Lo-Vaca* decision," Joint Appendix at 408, put the Commission on notice of the ground on which rehearing was being sought, and afforded the Commission a full opportunity to correct any error. We require no more. *See FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498,

75 S.Ct. 467, 471, 99 L.Ed. 583 (1955); *ASARCO, Inc. v. FERC*, 777 F.2d 764, 773–75 (D.C.Cir. 1985). We do not agree that Farmington's failure to cite to *Lo-Vaca's* progeny bars it from relying on those cases now.

**2.** Section 7(b) of the NGA prohibits a natural gas company from abandoning

> all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission....

15 U.S.C. § 717f(b).

were made in either category for particular uses, quantities or otherwise.

*Id.* at 516–17, 68 S.Ct. at 195 (emphasis by Court). The Court went on to note that the line conformed to the one that it had previously drawn between permissible and impermissible reaches of state power against attacks under the negative implications of the commerce clause. U.S. Const., art. I, § 8, cl. 3. *See* 332 U.S. at 517–18 n. 12, 68 S.Ct. at 195–96 n. 12. On the permitted side of the line were interstate sales to consumers, *see Pennsylvania Gas Co. v. Public Service Commission,* 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920); on the forbidden side were interstate sales for resale, *see Public Utilities Commission v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed.2d 54 (1927); *Missouri v. Kansas Natural Gas Co.,* 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924).

*Panhandle*'s holding, of course, was an affirmative finding of state regulatory power. But in *City of Hastings v. FPC,* 221 F.2d 31, 32–33, 38–39 (D.C.Cir.1954), *cert. denied,* 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252 (1955), this court applied *Panhandle*'s reasoning and unequivocal language to support the flipside—the absence of Commission authority. As here, the sales in question were to a city exclusively for use in the city's power plant.

■ Thus, even if the commingling by Amoco Production rendered its sales to Amoco Gas jurisdictional, the latter's sales to Farmington would not be. Farmington presents nothing in its arguments to support any such extension of Commission jurisdiction.

The first link of Farmington's claim is also unsupportable. It relies primarily on *California v. Lo-Vaca Gathering Co.,* 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965). There the Supreme Court considered the jurisdictional status of sales of gas to an interstate pipeline that were earmarked by contract to be used only in the pipeline's compressors. The pipeline, however, commingled the compressor gas with gas that it intended to sell for resale in interstate commerce. Consequently, some molecules nominally purchased for pipeline use would in fact be delivered to out-of-state purchasers for resale. The Court found even the earmarked purchases jurisdictional, and in so doing made a remark much stressed by Farmington: "[t]he fact that a substantial part of the gas [from a local producer] will be resold ... invokes federal jurisdiction at the outset over the entire transaction." 379 U.S. at 369, 85 S.Ct. at 488.

The core of the Court's reasoning was that if the purchase of gas for pipeline use were nonjurisdictional,

> [t]here would be created ... an "attractive gap" in the federal regulatory scheme ... which the producing States might have little incentive to close, since the gap would often involve either [1] lower costs to intrastate customers or else [2] merely higher pipeline costs which ultimately would be reflected in rates paid by consumers in other States.

379 U.S. at 370, 85 S.Ct. at 489. The case itself quite clearly involved the second type of gap. The cost of compressor gas would be passed on to interstate consumers as part of the pipeline's sales rates, and, as the Court pointed out, those costs were far from trivial: they amounted then to $85,-000,000 per year and 4% of the major interstate pipelines' total gas costs. *Id.* at 370 n. 2, 85 S.Ct. at 488 n. 2.

The facts of *Lo-Vaca* shed no light on the first type of gap, and the Court gave no example. Recently, however, in *Consolidated Oil & Gas Inc. v. FERC,* 806 F.2d 275 (D.C.Cir.1986), we addressed the situation of a gathering system that bought from multiple producers, reselling some gas in-state and the rest out-of-state. Some of the producers, invoking contract clauses purporting to earmark their gas for intrastate use, claimed their sales were nonjurisdictional. We observed:

> New Mexico [the producer state] has no authority to regulate the initial producer-to-gathering company sales since the end-users are not definably local, and the gathering company possesses the same theoretical potential to favor intrastate over interstate channels in designating the destination of particular sources of

gas that the Court seemed concerned about in *Lo-Vaca.*

806 F.2d at 278. In such a situation, it seems likely that thorough monitoring of all pipeline suppliers and complex attribution rules (of which there might be multiple, potentially conflicting sets, due to the presence of multiple jurisdictions) would be essential if the Commission were to assure itself that the aggregate purchases of gas *deemed* nonjurisdictional did not impermissibly exceed the amounts actually used instate. *See also FPC v. Amerada Petroleum Corp.*, 379 U.S. 687, 690–91, 85 S.Ct. 632, 634, 13 L.Ed.2d 605 (1965) (Goldberg, J., concurring) (Court's holding, that earmarking of commingled gas for in-state use does not immunize it from Commission jurisdiction, based partially on fact that sellers claiming nonjurisdictional status had "attributed to themselves a greater percentage of so called nonjurisdictional gas than their proportionate share of the gas in the commingled stream").

In *Consolidated,* moreover, we explicitly addressed the Commission's decision in this case, noting that extension of the commingling doctrine back to the producer's operations was at issue in the Commission's *Farmington* decision but not in *Consolidated.* 806 F.2d at 278. We even went further and observed that where, as is true in this case, "the producer chooses how much gas to dedicate to the interstate market and sells it separately from the gas it sells intrastate[,] ... [t]he intrastate portions of [the] ... sales are, of course, nonjurisdictional." *Id.*

■ We see no reason to retreat from that position. The Commission has long approved of the "commonplace" practice by which producers make only partial dedications to interstate commerce, *Amoco Production Co.*, 23 F.E.R.C. ¶ 61,211, at 61,434 (1983); *see El Paso Natural Gas Co.*, 54 F.P.C. 917, 918 (1975), *rev'd on other grounds sub nom. Southland Royalty Co. v. FPC*, 543 F.2d 1134 (5th Cir.1976), *rev'd sub nom. California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978), and the Fifth Circuit has expressed its approval of the practice,

*Columbia Gas Transmission Corp. v. Allied Chemical Corp.*, 652 F.2d 503, 516 n. 11 (5th Cir.1981); *cf. Harrison v. FERC*, 567 F.2d 308, 309–10 (5th Cir.1978) (producer can dedicate to interstate commerce gas produced from certain parcels without dedicating its contiguous parcels). Such partial dedications moreover, closely resemble a standard split-stream sale in which each of several owners of a production unit decides whether to commit its portion of unit production to interstate commerce. *See* H. WILLIAMS & C. MEYERS, OIL AND GAS TERMS 716–17 (5th ed. 1981). Application of the commingling doctrine to such sales would upset untold thousands of transactions.

The Commission's refusal to extend *Lo-Vaca* to partial dedications makes sense. First, unlike those of *Lo-Vaca* and *Consolidated,* such transactions are generally structured (as here) so that regulators in the state of consumption can regulate the wellhead price. Thus there is simply no regulatory gap. Such cases, then, are not significantly different from ones where an end user buys gas from a producer at the wellhead and arranges for commingled transportation. And the nonjurisdictional treatment of such sales, despite commingling, is well established. *See Sebring Utilities Commission v. FERC*, 591 F.2d 1003, 1017 (5th Cir.), *cert. denied*, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979); *American Public Gas Association v. FERC*, 587 F.2d 1089, 1097 n. 9 (D.C.Cir.1978) (per curiam).

Second, such arrangements obviously have no direct effect on the cost of service to out-of-state customers, as in *Lo-Vaca.* Indeed, it seems likely that assertion of jurisdiction would lead to a reduction in the gas available to the interstate market—or at any rate would have done so until the NGPA sharply reduced the Commission's jurisdiction over wellhead sales. *See* 15 U.S.C. § 3431(a)(1) (1982). Establishment of such a trap would have discouraged interstate sales of surplus gas for fear that such sales would lead to an inadvertent dedication of other gas to interstate commerce.

Finally, in a situation involving a *single producer's* allocation of its output between jurisdictional and nonjurisdictional uses, there is simply no attribution problem of the type that arose in both *Lo-Vaca* and *Consolidated.*

In support of its effort to extend *Lo-Vaca,* Farmington quotes some broad language in *Public Service Commission v. FERC,* 610 F.2d 439 (6th Cir.1979):

> The ultimate sale in other states of a substantial part of a producer's natural gas output invokes federal jurisdiction over the entire volume of production. The natural gas here at issue begins its journey in interstate commerce at the wellhead.

*Id.* at 444 (citing *Lo-Vaca*) (footnote omitted). The case is inapposite. The court there confronted a state's attempt to give intrastate purchasers a statutory preference in the purchase of certain interstate gas, and thereby to divert gas from *preexisting* interstate sales—over which the Commission clearly had jurisdiction—to serve local consumers. *See also Backus v. Panhandle Eastern Pipe Line Co.,* 558 F.2d 1373 (10th Cir.1977).

To conclude: neither of the two links essential to Farmington's claim is sound. *Lo-Vaca,* its mainstay, explicitly deferred the question "[w]hether cases could be conjured up where in spite of original commingling there might be a separate so-called nonjurisdictional transaction of a precise amount of gas not-for-resale within the meaning of the Act...." 379 U.S. at 370, 85 S.Ct. at 489 (footnotes omitted). At that juncture it pointed to *City of Hastings v. FPC,* 221 F.2d 31 (D.C.Cir.1954), *cert. denied,* 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1252 (1955), in which, as we have noted, this court refused to find Commission jurisdiction over a sale to an end user of gas that had once been commingled. Each proposed link in the Farmington theory would require extension of *Lo-Vaca* in conflict with the holding and reasoning of *Hastings.* As the Fifth Circuit has observed,

"[t]he Court has never extended [the Lo-Vaca] holding beyond [its] facts...." *Sebring Utilities Commission v. FERC,* 591 F.2d 1003, 1017 (5th Cir.), *cert. denied,* 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979). Farmington has suggested no persuasive reason why we should do so now.

Accordingly, we uphold the Commission's decision not to assert NGA jurisdiction over the sales in question.

### III. NGPA First-Sale Issue

Farmington contests the Commission's finding that the sales from Amoco Gas to Farmington in 1982 pursuant to the preliminary injunction were not "first sales," within the meaning of NGPA § 2(21), 15 U.S.C. § 3301(21) (1982), and therefore not subject to the ceiling prices of the NGPA, *see* 15 U.S.C. §§ 3312–3319. Farmington maintains that it is entitled to reimbursement for charges by Amoco Gas for that period to the extent that they exceeded any applicable NGPA ceiling.[3]

The NGPA imposes price ceilings only on "first sales." As relevant here, § 2(21)(A) of the NGPA defines a "first sale" broadly to include, among other things, "any sale of any volume of natural gas ... to any person for use by such person...." 15 U.S.C. § 3301(21)(A). The sale from Amoco Gas to Farmington unquestionably falls within this definition. But the NGPA goes on to add an exclusion, which it in turn qualifies. It excludes from the first-sale definition

> the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, *unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.*

*Id.* § 3301(21)(B) (emphasis added for the qualification). There is no dispute that Amoco Gas is a local distribution company, *see id.* § 3301(17), nor that Amoco Produc-

---

**3.** The briefs give only rudimentary treatment to the problem of how the gas would be classed among NGPA pricing categories if they were applicable. We express no opinion on the subject.

tion is its affiliate, *see id.* § 3301(27). Thus, the sale from Amoco Gas to Farmington seems to fit the statute's inclusory language, *i.e.,* the qualification to the exclusion: it is a "sale … by any … local distribution company … [but is] attributable to … gas produced by such … local distribution company, *or any affiliate thereof.*" More generally, a seller (whether an "interstate pipeline," an "intrastate pipeline," a "local distribution company," or an "affiliate thereof") is engaged in a "first sale" if it is selling gas produced *either* by the seller itself ("such" seller) *or* by its affiliate ("any affiliate thereof").[4]

The Supreme Court's decision in *Public Service Commission v. Mid-Louisiana Gas Co.,* 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), presupposes this construction of § 2(21)(B). There the Court reviewed orders of the Commission that had partially denied first-sale treatment to interstate pipelines' wellhead production, where the firms transferred the gas to their transmission divisions. In contrast, the orders granted virtually complete first-sale treatment to gas purchased by pipelines from either independent producers or pipeline affiliates. 463 U.S. at 323, 103 S.Ct. at 3027. The Commission had relied on a variety of distinctions between *intra-* and *inter* corporate transfers, all of which the Court rejected as unsupported by the language and history of the NGPA. *Id.* at 337–42, 103 S.Ct. at 3034–37. The Court clearly worked from the premise that "any affiliate," as used in the clause qualifying § 2(21)(B)'s exclusion, referred to "any affiliate" of any of the types of firms identified in the exclusion. *Id.* at 337, 103 S.Ct. at 3034. Although the case itself involved interstate pipelines rather than local distribution companies, the language of the NGPA demands parallel treatment of the latter.

The Commission, ignoring the Supreme Court's assumption, contends that the qualification operates only if the source of gas (referred to in the qualification) is the *same corporation* as the seller, referred to in the exclusion itself, not where the source of gas is merely an affiliate of the selling company. *See* 31 F.E.R.C. ¶ 61,290, at 61,-601. This appears to rewrite the qualifying language to read either "unless such sale is attributable to volumes of *its own* natural gas production," or (equivalently) "unless such sale is attributable to *such* interstate pipeline, intrastate pipeline, local distribution company, *or affiliate.*"

The Commission effectively concedes on appeal that its reading requires quite a stretch of the language. *See* Brief for Respondent at 25 ("Farmington insists … that this provision must be given a literal reading."). "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), *quoted in United States v. Dickson,* 816 F.2d 751, 752 (D.C.Cir.1987).

Nor did the Commission proffer any compelling reason for abandoning the literal statutory language. The Commission's sole justification was that:

[t]he purpose of [ § 2(21)(B) ] was to avoid having a local distribution company involved in two first sales, first as a purchaser from the producer and then as a seller to its customer. Otherwise, even though the local distribution company paid the producer the applicable NGPA

---

4. The only oddity caused by this reading arises in the situation where the seller is itself an *"affiliate"* of a pipeline or local distributor. The affiliate's sales are not first sales *unless* they are attributable to gas "produced by *such* interstate pipeline, intrastate pipeline, local distribution company" or (as we have just read the provision) to "any affiliate" of *"such* interstate pipeline, intrastate pipeline, or local distribution company." Oddly, under the literal reading, the parallel construction "such affiliate" is missing. At first glance, that omission would appear to mean that a local distributor that produces the gas it sells is subject to the NGPA ceiling, but an affiliate that produces the gas it sells is not. On closer examination, however, the discrepancy can be resolved. In the situation posed, the sale is clearly made by an affiliate of a local distribution company, but the gas sold is *also* produced by an affiliate of *such* local distribution company (the one with which the affiliate is affiliated). To be sure, the latter affiliate is the same as the former. But nothing in either grammar or logic precludes that construction.

maximum lawful price for gas, it generally would have to sell the gas for that same price and the compensation for the service it performed would be limited by Subpart K of Part 271 [18 C.F.R. §§ 271.1100–.1106 (1986), allowing a first sale to exceed the NGPA ceiling price to the extent necessary to recoup state severance taxes and the seller's "production-related" costs (including transportation costs)].

31 F.E.R.C. at 61,601 (footnotes omitted).

Both arguments seem to us to have been authoritatively rejected by the Supreme Court in *Mid-Louisiana.* First, the Court found that under § 2(21)(B) "there can be many first sales of a single volume of gas between the well and the pipeline's customers." 463 U.S. at 325–26, 103 S.Ct. at 3029. Thus, under the Court's construction of § 2(21)(B), a particular firm may often be found to have participated twice in a first sale of the same gas, first as buyer and then as seller. The idea of multiple "first sales" is linguistically odd, to be sure: in common parlance a given series can have but one "first." But common parlance does not control when Congress expressly defines a technical term.

Second, the Court made clear that the Commission need not give " 'first sale' treatment" to every first sale. *Id.* at 327, 103 S.Ct. at 3029. In the context in which an interstate pipeline company produced gas and then transferred it to its pipeline, the Court stated:

(1) It would be reasonable for the Commission not to give first sale treatment to the intracorporate transfer, *as long as such treatment is given to the downstream transfer.* (2) Similarly, it would be reasonable for the Commission not to give first sale treatment to the downstream transfer, *as long as such treatment is given to the intracorporate transfer.*

*Id.* at 343 n. 24, 103 S.Ct. at 3037 n. 24 (emphasis in original). But the Court gave the Commission the option only after having found that both transfers were first sales. *Id.* at 327, 103 S.Ct. at 3029. Thus classification of the Amoco Gas/Farmington sale as a first sale by no means would require the Commission to subject it to NGPA pricing. That decision would turn on an analysis of the purposes of the NGPA. *Id.*

At least one purpose apparent in the NGPA's extending price ceilings to the intrastate market was to prevent high intrastate prices from luring production away from the then shortage-ridden interstate market. *See Mid-Louisiana,* 463 U.S. at 330–31, 103 S.Ct. at 3031. Two propositions seem to follow. First, where an intrastate pipeline or a local distribution company markets its own gas in the state of production, the intrastate market forces would normally tend to generate such a luring effect unless either (a) the Commission imposed first-sale treatment on the firm's selling price or (b) the Commission subjected the well-head transfer to first-sale treatment and state regulatory authority prevented the firm from selling the gas for more than the NGPA ceiling plus a cost-based increment. Second, this economic effect is every bit as likely when the producer and intrastate pipeline or distributor are affiliates as when they are parts of the same corporate entity. *Cf. Mid-Louisiana,* 463 U.S. at 327–28, 337, 103 S.Ct. at 3029–30, 3034. Assuming the truth of those propositions generally, however, the matter might be different here: the sales in question arose not from the operation of market forces at all but through the edict of a federal district court. *See supra* p. 1310.

As the Commissior based its decision here on the view that the sale was not a first sale at all, it had no occasion to address the issue of first-sale treatment.[5]

---

**5.** The Commission and Amoco Gas suggest that the Commission has already made the election in a generally applicable rule. Brief for Respondent at 30–31 (citing Order No. 391, 49 FED.REG. 33,849 (1984), *on reh'g,* 31 F.E.R.C. ¶ 61,036 (1985), *remanded on other issues sub nom. Phillips Petroleum Co. v. FERC,* 792 F.2d 1165 (D.C.Cir.1986)); Brief for Intervenor at 40–41 (same). We are uncertain that the regulations thereby promulgated, 18 C.F.R. §§ 270.-203(b)(3), (c) (1986), reach so far. While they clearly give first-sale treatment to the transfer

Accordingly, we remand to the Commission to give the parties an opportunity to address, and the Commission to decide, that issue. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

\* \* \*

The petition for review is granted and the case is remanded for proceedings consistent with this opinion.

*So ordered.*

WALD, Chief Judge, concurring in part, dissenting in part:

While I concur in Part I of the panel opinion dealing with FERC jurisdiction over the split sale, I have grave doubts about the panel's decision that the sale from the local distribution company to Farmington is a "first sale" under section 2(21) of the NGPA. Section 2(21), as I read it, is definitely ambiguous as to whether it includes within "first sales" not just sales by the pipeline or distributor or affiliate of the seller's own production but sales of the production of any affiliate of the pipeline or distributor, as well. While I agree that deference to an agency interpretation is not always mandated when a question of pure statutory construction is involved, *see INS v. Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987), I would give more deference than the panel does in the case of an ambiguous statute, with no helpful legislative history, in a complex and technical area of the law. Here, the Commission discoursed at length and plausibly as to why it believed a "first sale" classification of Amoco Gas to Farmington would be ill-advised. 31 FERC ¶ 61,290 (June 7, 1985), Joint Appendix at 399–402. Nor do I read *Public Service Commission v. Mid-Louisiana Gas Co.*,

463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), as giving any guidance on this situation, which, of course, involves sales of an affiliate's gas to a customer, not an intracorporate transfer.

It is also quite clear that even if the statute were to be interpreted to include the sale to Farmington as a "first sale," the FERC in its regulations has definitely made its choice as to where "first sale" treatment in a situation like this occurs, 18 C.F.R. § 270.203, and *Mid-Louisiana* holds that the NGPA permits the Commission to make such a choice. 463 U.S. at 327, 103 S.Ct. at 3029. On balance then I see it as both questionable legally and fruitless for the court to remand so that the FERC can exercise a theoretical choice as to whether to allow first sale treatment to this transaction.

from a distributor's producing unit to its transmission unit, they do not expressly address subsequent transfers by the distributor.

Amoco also relies on *Louisiana Gas System, Inc.*, 22 F.E.R.C. ¶ 61,308 (1983), a pre-*Mid-Louisiana* case noting that "sales by LGS [an intrastate pipeline] not attributable to *its own* production ... are not *regulated* [as first sales]." *Id.* at 61,535 (emphasis added). Nothing in *Louisiana Gas System* suggests any Commission in-

tention to draw a distinction between a seller's "own" and its affiliate's production in excepting such production from its general exclusion from first-sale treatment.

Even if the Commission has elected not to treat the down-stream transaction as a first sale generally, its decision below did not rely on or make any such election. Rather, the Commission maintained simply that the Farmington sale was *not* a first sale.