HADSON GAS SYSTEMS, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Enron Capital & Trade Resources Corporation, Intervenor.

No. 95–1111.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1995.

Decided Feb. 9, 1996.

Philip M. Marston, Washington, DC, argued the cause and filed the briefs, for petitioner.

Jill L. Hall, Attorney, Federal Energy Regulatory Commission, Washington, DC, with whom Jerome M. Feit, Solicitor, was on the brief, argued the cause, for respondent. Joel M. Cockrell, Attorney, entered an appearance.

Leslie J. Lawner, Houston, TX, entered an appearance, for intervenor.

Before: EDWARDS, Chief Judge, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

On July 28, 1994 the Federal Energy Regulatory Commission issued Order No. 567, sweeping away obsolete regulations that had occupied more than 500 pages of fine print in the Code of Federal Regulations. Order No. 567, *Removal of Outdated Regulations Pertaining to the Sales of Natural Gas Production,* 59 Fed.Reg. 40,240 (1994), Order on Rehearing, 69 FERC ¶ 61,055 (October 17, 1994), Order on Rehearing, 69 FERC ¶ 61,-342 (December 15, 1994). The regulations were obsolete—or, as we shall see, almost all of them were—because they existed solely for the purpose of implementing the Commission's 38–year–old enterprise of controlling the prices of natural gas at the wellhead, which it had pursued from the Supreme Court's decision in *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), to January 1, 1993, when all such controls came to an end. See Natural Gas Wellhead Decontrol Act of 1989 (the "Decontrol Act"), Pub.L. No. 101–60, 103 Stat. 157 (1989). Tucked away in this mass was a single sentence, 18 CFR § 270.203(c), which, though enacted solely for purposes of the price control regime, appears to have material collateral importance. Hadson claims that because of these collateral effects, the Commission was required by § 553 of the Administrative Procedure Act to give affected parties notice and an opportunity to comment, in order to consider (1) arguments for retaining § 270.203(c) or at least (2) ways of mitigating the impact of its removal.

We deny the petition for review. Because the controlling statute left the Commission no authority to retain § 270.203(c), notice and comment could not have served the first purpose suggested by Hadson. As to the second, at least in these circumstances we do not think that § 553 requires an agency to delay formal removal of a legally defunct regulation while it canvasses all possible regulatory impacts. We note, however, that because Hadson has shown that formal removal may have substantial ripple effects, to the point of undermining implicit premises of other regulations, it may have established grounds requiring the Commission to open a rulemaking proceeding for purposes of adjusting those regulations to the new realities. We do not, of course, pass on any such claim, which at this point is hypothetical.

\* \* \*

Although the paradigm sale to which *Phillips* extended the Commission's regulatory power under the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 *et seq.,* was the wellhead sale, the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301 *et seq.,* which largely supplanted the Commission's pre-NGPA rules, used a different term, "first sale." It made two critical consequences turn on a transaction's classification as such. First, Title I of the statute subjected every first sale to the NGPA system of price controls. See 15 U.S.C. §§ 3312–19, repealed effective Jan. 1, 1993, Pub.L. No. 101–60, § 2(b). Second, it generally removed first sales of gas from the Commission's jurisdiction (apart from its enforcement of the NGPA ceiling prices).[1] See, e.g., NGPA § 601(a)(1)(A), 15 U.S.C. § 3431(a)(1)(A). This relieved parties engaged in a first sale of the serious regulatory burdens that would otherwise have been applicable under *Phillips:* the needs for a certificate of "public convenience and necessity" for initiation of a sale, as required by NGA § 7(c), 15 U.S.C. § 717f(c), for a certificate of abandonment for its termination, as required by NGA § 7(b), 15 U.S.C. § 717f(b), and for Commission review of the price under the "just and reasonable" standard, as required by NGA §§ 4 & 5, 15 U.S.C. §§ 717c & 717d.

Thus the definition of first sale was critical:

(21) First sale

(A) General rule

The term "first sale" means any sale of any volume of natural gas—

(i) to any interstate pipeline or intrastate pipeline;

(ii) to any local distribution company;

---

1. The NGPA contained certain exclusions, such as for gas "committed or dedicated to interstate commerce" on the day before the date of enactment. These exclusions were eliminated by the Decontrol Act. See Decontrol Act, § 3(b)(7), amending NGPA § 601(a)(1), 15 U.S.C. § 3431(a)(1).

(iii) to any person for use by such person;

(iv) which precedes any sale described in clauses (i), (ii), or (iii); and

(v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) *and is defined* by the Commission as a first sale *in order to prevent circumvention of any maximum lawful price established under this chapter.*

(B)  Certain sales not included

Clauses (i), (ii), (iii), or (iv) of subparagraph (A) *shall not include the sale* of any volume of natural gas *by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof,* unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.

NGPA § 2(21), 15 U.S.C. § 3301(21) (emphasis added).

Two aspects of this elaborate definition are relevant for our purposes.  First, the opening clause of § 2(21)(B) *denies* first-sale treatment to sales by affiliates of interstate or intrastate pipelines, or of local distribution companies, thereby exposing them to the regulatory entanglements of the NGA.  Hadson is affiliated with two intrastate pipelines and a local distribution company, so the first clause of § 2(21)(B) excludes its gas sales from classification as first sales.  The second clause of § 2(21)(B), to be sure, makes an exception from the first clause's exclusion, saying (once we account for the double negatives) that sales by such affiliates of their *own* gas production can be first sales.  But Hadson made clear at oral argument that that exception was of little or no use to it.  Hadson appears, moreover, to be typical of an array of gas marketers that have the sort of affiliation that bars their sales from first-sale treatment under the first clause of § 2(21)(B).

Second, § 2(21)(A)(v) grants the Commission authority to *add* sales to Congress's first-sale definition, i.e., to turn some transactions not otherwise covered into first sales, "in order to prevent circumvention of any

maximum lawful price established under this chapter."  In 1979 the Commission saw a risk of precisely such circumvention, and to avert it, adopted the sentence at stake here:

(c) Circumvention rule for certain sales by affiliates.  Any sale by an affiliate of an interstate pipeline, intrastate pipeline, or local distribution company, that is not itself such a pipeline or local distribution company is that affiliate's first sale under the NGPA unless the Commission, on application, determines not to treat such sale as a first sale.

18 CFR § 270.203(c).  Thus the Commission used its § 2(21)(A)(v) power to give first-sale status to the sort of sales currently engaged in on a large scale by Hadson and similar firms—sales otherwise excluded from first-sale status by § 2(21)(B).  In part thanks to the shelter of § 270.203(c), Hadson and similarly affiliated gas marketers have annually conducted billions of dollars worth of natural gas business as first sales.

When it adopted § 270.203(c), the Commission made clear that it was acting *solely* under § 2(21)(A)(v), *not* under the NGPA's generic grant of power "to define" terms used in the NGPA, § 501(b), 15 U.S.C. § 3411(b).  See *Final Rule Governing the Maximum Lawful Price for Pipeline, Distributor or Affiliate Production* ("Final Rule"), 44 Fed.Reg. 66577, 66579–80 (1979).  It explained that, in part because of its own narrow definition of "attributable" (as the term is used in § 2(21)(B)), see 18 CFR § 270.203(a), sales by gatherers who were affiliated with pipelines or distributors would, but for action by the Commission under § 2(21)(A)(v), "be excluded from first sale treatment where the gatherer did not produce all of the gas sold."  Final Rule, 44 Fed.Reg. at 66580/1.  Hadson does not dispute that in adopting § 270.203(c) the Commission relied solely on § 2(21)(A)(v).

This might seem to end the case.  Although the Decontrol Act did not delete § 2(21)(A)(v) itself, it did eliminate the entire system of "maximum lawful price[s]," thereby removing the Commission's sole reason for creating § 270.203(c) and mooting the sole basis given by § 2(21)(A)(v) for Commission additions to first-sale status.  If Con-

gress pulled the rug out from under § 270.203(c), by eliminating the sole stated justification for its existence, must it not fall to earth, i.e., lose all effectiveness, whether or not the Commission actually deleted it from the pages of the Code of Federal Regulations? If so, would not deletion be simply a ministerial task, unsuited to notice and comment procedures intended for substantive regulatory changes in which the agency has some authority? See *Sheppard v. Sullivan,* 906 F.2d 756, 761–62 (D.C.Cir.1990) (finding it at most "harmless error" for an agency to modify a regulation without notice and comment when the statute leaves the agency no choice). Indeed, the Commission frames this argument as one of standing, saying that Hadson's injury, if any, is due to Congress's decision, not to the Commission's action.

■ Hadson says no, on two grounds. First, although it does not argue that § 270.203(c) is consistent with § 2(21)(B) of the statute (once the § 2(21)(A)(v) prop is rendered moot), it suggests that the Commission's power under NGPA § 501(b), 15 U.S.C. § 3411(b), "to define, by rule, accounting, technical, and trade terms used in this chapter," enables it to preserve § 270.203(c). It buttresses this reliance on § 501(b) with citations to various prior general statements by the Commission about the breadth of its § 501(b) powers and even instances—none endorsed by a court, so far as appears—of creative interpretative work by the Commission, such as construing "not" to mean "is," see 18 CFR § 271.803(b), and "and" to mean "or," see "Interpretive Rule; Commission Interpretation of Section 314 of the NGPA," 44 Fed.Reg. 18,966 (1989).

Because the Commission's standing defense is logically indistinguishable from the parties' dispute over § 501(b), we turn directly to that dispute over the merits, see *Brotherhood of Railway Carmen v. ICC,* 917 F.2d 1136, 1137–38 (8th Cir.1990), and reject Hadson's contention. The Commission points out that § 501(b) goes on to state a qualification (which in any event would probably be inferred), that its definitions "shall be consistent with the definitions set forth in this chapter." NGPA § 501(b), 15 U.S.C. § 3411(b). In its Order on Rehearing of

Order No. 567 the Commission noted the express qualification and said:

> For the Commission to define first sales for purposes other than circumvention [i.e., the purpose authorized in § 2(21)(A)(v) and invoked in the promulgation of § 270.203(c) ] would be inconsistent with the definition of first sales established by Congress in section 2(21) of the NGPA. The Commission cannot exceed the authority granted to it by the statute in performance of its duties.

69 FERC ¶ 61,342 at 62,285 (December 15, 1994). Unless § 501(b) grants the Commission power completely to disregard the statutory language—dubious in general but unthinkable in the case of a statute with the Byzantine detail of the NGPA—the Commission is right. Section 2(21)(B) is an insuperable obstacle to achieving the result desired by Hadson, and § 501(b) is not an all-purpose escape hatch.

Hadson offers a fallback theory for requiring notice and comment. It argues that removal of § 270.203(c) exposes as hopelessly inadequate, the Commission's earlier efforts to reconcile the application of the NGA to affiliated marketers' business with the realities of the present natural gas market by means of various "blanket" certification provisions. See Order No. 547, *Regulations Governing Blanket Marketer Sales Certificates,* 57 Fed.Reg. 57,952, rehearing denied, 62 FERC ¶ 61,239 (1992). Accordingly, the Commission should have provided notice and an *opportunity to comment in order to consider what regulatory amendments might be necessary in order to cushion the blow effected by removal of § 270.203(c).*

Hadson points out, for example, that some of the parties to whom it wishes to sell gas ask for an affirmation that purchase of the gas will not subject the buyer to the Commission's jurisdiction, and for a warranty against any adverse consequences of such classification. The buyers' practice is understandable. Under Commission rulings, gas that is sold in a jurisdictional transaction continues to be jurisdictional gas in the buyer's hands, i.e., subjects the buyer's sale or transportation of the gas to Commission jurisdiction. *Delhi Gas Pipeline Corp.,* 19 FERC ¶ 61,189

(1982). Hadson evidently believes that while § 270.203(c) was on the books (though moribund), it could make the necessary claim as to its gas. And purchasers would evidently accept the claim. Deletion of § 270.203(c), however, reduces the plausibility of a claim of nonjurisdictional status to zero. While it may seem unlikely that purchasers would be ready to rely on so frail a reed as § 270.203(c), or on warranties of nonjurisdictional status based thereon, Hadson's claim suggests that the deletion of § 270.203(c) on paper, however formalistic it may seem on its face, has real-world effects.

In considering the possible attention paid to a formally conclusive but substantively hollow provision, we recognize that from the *Phillips* decision forward (right through to the present, if Hadson's contentions are correct), jurisdictional gas was like a disastrous virus—highly communicable and, if not fatal, at least debilitating. For example, where a gathering company collects gas from several producers, commingles the gas, and sells some in-state and some out-of-state, even the in-state sales are jurisdictional, see *Consolidated Oil & Gas Inc. v. FERC*, 806 F.2d 275 (D.C.Cir.1986), subject to some limited exceptions, see *City of Farmington v. FERC*, 820 F.2d 1308 (D.C.Cir.1987). In the past, as we noted before, jurisdictional status brought with it the whole suffocating apparatus of Commission regulation over initiation of and termination of a sale, and the "justness" and "reasonableness" of the price. The Commission does not dispute that in today's highly competitive, fast-moving gas market, it would be fatal to a gas marketer's business to be exposed to such regulation in its traditional form. Accordingly, it is not implausible that deletion of § 270.203(c) may make some of the parties with whom Hadson deals more skittish.

Moreover, Hadson suggests that there are glitches in the Commission's blanket certificate regulations, which before the removal of § 270.203(c) were only "amusing points of academic interest," but which became "very real" problems on its deletion. For example, it argues that the Commission's provision of blanket certification for certain parties that "release" capacity on an interstate pipeline, 18 CFR § 284.243(g), a practice in which

marketers will evidently have to engage as a normal concomitant of their business, implies that any such party is engaged in jurisdictional transportation, i.e., making it equivalent to an interstate pipeline. Yet, it says, under Order No. 547, interstate pipelines are ineligible for blanket marketer certificates. See 18 CFR § 284.402(a).

Implicit in Hadson's fallback argument is the view that notice and comment are required where a regulatory deletion, even though legally necessary, may create strong policy reasons for regulatory alterations elsewhere. It would follow that an agency with a legally obsolete regulation on the books— which it in some sense might be seen as legally *bound* to excise from the Code of Federal Regulations as soon as possible— would need to (1) ask itself whether removal of the whited sepulchre might leave some parties adversely affected in ways that might be mitigated by regulatory changes elsewhere; (2) start a proceeding inviting commentary of that sort; and then, presumably, (3) start whatever extra rounds of notice-and-comment might be necessary to address the various proposed collateral changes. Meanwhile, there might be parties whose interests would be advanced by the agency's conforming its regulations to the statute, who would lose that benefit while all this goes on.

■ We think the problem of persons in Hadson's position is better satisfied by another device under the APA—the entitlement to petition the agency to open a rulemaking to amend existing regulations. See 5 U.S.C. § 553(e). Although such a reopening is within the discretion of the Commission, its denial of reopening is judicially reviewable. *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 3–4 (D.C.Cir.1987). And although the review is under the deferential arbitrary-and-capricious standard, perhaps the strongest case for initiating such a rulemaking is where "a petition has sought modification of a rule on the basis of a radical change in its factual premises." *Id.* at 5; see also *Geller v. FCC*, 610 F.2d 973 (D.C.Cir. 1979); *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C.Cir.1981). While there is no indication that § 270.203(c)'s limit on the scope of jurisdictional transactions was an explicit assumption of the Commission's blanket certificate rules, Hadson's arguments suggest that

its removal indeed exposes enormous gaps. These arguments are expressed most acutely in its reply brief, to which the Commission has had no opportunity to respond, but, if unrebutted, they would seem to make out a promising case for an amendatory rulemaking. Accordingly, we suggest that the Commission treat Hadson's submissions in this case, and/or such other papers as Hadson may think useful, as a petition to open a rulemaking. But we reject Hadson's contention that the possible need for such collateral amendments makes notice-and-comment an obligatory condition of an agency's deletion of a regulation that it has no authority to maintain.

Hadson also argues that § 502(b) of the NGPA, 15 U.S.C. § 3412(b), requiring an opportunity for an oral presentation with respect to any proposed rule "[t]o the maximum extent practicable," compels the Commission to afford such an opportunity. Again, however, the Commission's complete lack of choice in the matter of excising § 270.203(c) either renders that provision inapplicable or makes its disregard harmless error.

The petition for review is

*Denied.*